ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1337 (and consolidated cases)

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

INTERNATIONAL DARK-SKY ASSOCIATION, INC., et al.,

*Appellants,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Appellees,*

SPACE EXPLORATION HOLDINGS, LLC,

*Intervenor.*

On Appeal of an Order of the
Federal Communications Commission

## FINAL OPENING BRIEF FOR APPELLANT DISH NETWORK CORPORATION

Jeffrey H. Blum
Alison Minea
Hadass Kogan
**DISH NETWORK CORPORATION**
1110 Vermont Avenue NW
Suite 450
Washington, D.C.  20005

Pantelis Michalopoulos
Andrew M. Golodny
Mark C. Savignac
William Travis West
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C.  20036
(202) 429-6494
PMichalo@steptoe.com

*Counsel for DISH Network Corp.*

August 8, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellant DISH Network Corp. certifies as follows:

### A. Parties

#### Appellants

The Appellants in this matter are: (1) DISH Network Corporation (Case No. 23-1001) and (2) The International Dark-Sky Association, Inc. (Case No. 22-1337).

#### Appellees

The Appellees in the consolidated case are the Federal Communications Commission and the United States of America.

#### Intervenor

Space Exploration Holdings, LLC ("SpaceX") is an intervenor in the consolidated case.

### B. Rulings Under Review

DISH and the International Dark-Sky Association have sought judicial review of the final Commission order captioned: *In the Matter of Space Exploration Holdings, LLC; Request for Orbital Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System*, Order and Authorization, IBFS File Nos. SAT-LOA-20200526-00055

and SAT-AMD-20210818-00105, Call Sign S3069, FCC 22-91 (rel. Dec. 1, 2022).

## C. Related Cases

1. *DISH Network Corporation v. FCC*, Case No. 23-1001
2. *International Dark-Sky Association v. FCC*, Case No. 22-1337

## CORPORATE DISCLOSURE STATEMENT

DISH Network Corporation is a publicly traded corporation on the NASDAQ Global Select Market under the symbol "DISH."  It has no publicly held subsidiaries.  Its subsidiaries operate pay-TV and wireless businesses.  No publicly held corporation owns 10% or more of its stock except for Dodge & Cox.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ii

CORPORATE DISCLOSURE STATEMENT ................................................. iv

GLOSSARY ....................................................................................... xi

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION ..........................................................2

STATEMENT OF THE ISSUES ..............................................................2

STATUTES AND REGULATIONS ..........................................................3

STATEMENT OF THE CASE .................................................................3

    A.    SpaceX's Second-Generation System ....................................... 3

    B.    The FCC's Duty to Prevent Interference and the ITU's Role 6

    C.    SpaceX's First-Generation System ......................................... 9

    D.    SpaceX's Second-Generation System ................................... 11

    E.    SpaceX's (Absent) Engineering Studies ............................... 13

    F.    The Order ........................................................................... 15

SUMMARY OF ARGUMENT ................................................................18

STANDING .......................................................................................22

ARGUMENT .....................................................................................23

I.    The Order Is Arbitrary and Capricious ........................................23

    A.    The Arbitrary-and-Capricious Standard of Review ............. 24

    B.    The Commission Disregarded Undisputed Evidence That SpaceX's Operations Will Exceed the Power Limits ........... 26

    C.    The Order Violated the FCC's Own Rules ............................. 40

    D.    The FCC Contradicts Itself by Relying on Rules It Waived 45

II.    The FCC Unlawfully Subdelegated Its Authority ..............................48

CONCLUSION ...................................................................................58

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ALLTEL Corp. v. FCC,*
838 F.2d 551 (D.C. Cir. 1988) .............................................................. 38

*Am. Farm Bureau Fed'n v. EPA,*
559 F.3d 512 (D.C. Cir. 2009) .............................................................. 38

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.,*
25 F.4th 1 (D.C. Cir. 2022) .................................................................. 25

*Am. Radio Relay League, Inc. v. FCC,*
524 F.3d 227 (D.C. Cir. 2008) ........................................................ 37, 38

*Animal Legal Def. Fund, Inc. v. Perdue,*
872 F.3d 602 (D.C. Cir. 2017) .............................................................. 29

*Butte Cnty. v. Hogen,*
613 F.3d 190 (D.C. Cir. 2010) .............................................................. 38

*City & Cnty. of San Francisco v. FERC,*
24 F.4th 652 (D.C. Cir. 2022) .............................................................. 25

*Comcast Corp. v. FCC,*
579 F.3d 1 (D.C. Cir. 2009) .................................................................. 38

*Constellation Mystic Power, LLC v. FERC,*
45 F.4th 1028 (D.C. Cir. 2022) ........................................................ 30, 35

*Consumers' Research v. FCC,*
63 F.4th 441 (5th Cir. 2023) ................................................................ 52

*Defs. of Wildlife v. Gutierrez,*
532 F.3d 913 (D.C. Cir. 2008) .............................................................. 48

*\*FCC v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021) .......................................................... 24, 39, 40, 45

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) ......................................... 37, 38

*Home Box Office v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977) ............................................ 36, 42

*La. Pub. Serv. Comm'n v. FERC*,
    761 F.3d 540 (5th Cir. 2014) ................................................. 49

*La. Pub. Serv. Comm'n v. FERC*,
    860 F.3d 691 (D.C. Cir. 2017) ............................................. 48

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................. 22

*Missouri Pub. Serv. Comm'n v. FERC*,
    337 F.3d 1066 (D.C. Cir. 2003) .......................................... 29

*Morall v. DEA*,
    412 F.3d 165 (D.C. Cir. 2005) ............................................. 38

\**Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.
    Co.*, 463 U.S. 29 (1983) ................................... 25, 34, 39

*Nat. Res. Def. Council v. EPA*,
    464 F.3d 1 (D.C. Cir. 2006) ................................................. 50

*Prof. Air Traffic Controllers Org. v. Fed. Lab. Rel. Auth.*,
    685 F.2d 547 (D.C. Cir. 1982) ............................................. 42

*PSSI Global Servs., LLC v. FCC*,
    983 F.3d 1 (D.C. Cir. 2020) ................................................. 24

*Robinson v. NTSB*,
    28 F.3d 210 (D.C. Cir. 1994) ............................................... 38

*Rodway v. U.S. Dep't of Agric.*,
    514 F.2d 809 (D.C. Cir. 1975) ............................................. 35

*S. Pac. Transp. Co. v. Watt*,
    700 F.2d 550 (9th Cir. 1983) ......................................... 52, 53

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC,*
    992 F.3d 1071 (D.C. Cir. 2021) ............................................................ 35

*Sw. Airlines Co. v. TSA,*
    650 F.3d 752 (D.C. Cir. 2011) ............................................................ 53

*Texas v. Comm'r,*
    142 S. Ct. 1308 (2022) ...................................................................... 51

*Texas v. Rettig,*
    987 F.3d 518 (5th Cir. 2021) ............................................................ 52

*\*U.S. Telecom Ass'n v. FCC,*
    359 F.3d 554 (D.C. Cir. 2004) ............................... 48, 49, 50, 51, 54, 55

*United States v. Matherson,*
    367 F. Supp. 779 (E.D.N.Y. 1973) ...................................................... 51

*\*Viasat Inc. v. FCC,*
    47 F.4th 769 (D.C. Cir. 2022) ........................ 5, 11, 22, 24, 26, 30, 36, 49

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
    749 F.2d 788 (D.C. Cir. 1984) ............................................................ 35

## Administrative Decisions

*2000 Non-Geostationary Order*
    *Amendment of Parts 2 and 25 of Commission's Rules to*
    *Permit Operation of NGSO FSS Systems Co-Frequency*
    *with GSO and Terrestrial Systems in the Ku-band,*
    16 FCC Rcd. 4096 (2000) ................................................................ 6, 7

*2017 Non-Geostationary Order*
    *Update to Parts 2 and 25 Concerning Non-Geostationary,*
    *Fixed-Satellite Service System and Related Matters,*
    32 FCC Rcd. 7809 (2017) .................................................................... 8

*Amendment of Ex Parte Rules Order*
    *Amendment of the Commission's Ex Parte Rules and*
    *Other Procedural Rules,*
    26 FCC Rcd. 4517 (2011) ............................................................ 36, 40

*Gen1 Order*
    *Space Exploration Holdings, LLC Request for*
    *Modification of the Authorization for the SpaceX NGSO*
    *Satellite System,*
    36 FCC Rcd. 7995 (2021) ..................................................... 3, 10, 30, 43

*Order
    *Space Exploration Holdings, LLC, Request for Orbital*
       *Deployment and Operating Authority for the SpaceX*
       *Gen2 NGSO Satellite System*, Order and
       Authorization, File Nos. SAT-LOA-20200526-00055
       and SAT-AMD-20210818-00105, FCC 22-91 (rel. Dec.
       1, 2022) ... 3, 15, 16, 17, 18, 19, 20, 21, 26, 27, 28, 30, 32, 36, 40, 43,
       45, 46, 53, 54

## Statutes

5 U.S.C. § 706 ...................................................................... 24, 35

28 U.S.C. § 2112(b) ..................................................................... 35

47 U.S.C. § 303(c) ......................................................................... 6

47 U.S.C. § 303(f).................................................................. 7, 33, 49

47 U.S.C. § 303(r) ....................................................................... 52

47 U.S.C. § 307(a) ........................................................................ 7

47 U.S.C. § 309(a) ........................................................................ 7

47 U.S.C. § 316(a)(1)...................................................................... 7

47 U.S.C. § 402(b)(6)........................................................... 2, 21, 22, 56

47 U.S.C. § 402(c) ......................................................................... 2

## Rules and Regulations

47 C.F.R. § 1.4(b)(2)....................................................................... 2

*47 C.F.R. § 1.1202(a) ............................................................ 20, 40, 41

47 C.F.R. § 1.1204(a)(10)(iii) ......................................................... 41

47 C.F.R. § 1.1206 ............................................................................ 40

47 C.F.R. § 1.1206(b)(2)(i) ............................................................. 41

47 C.F.R. § 2.106 n.5.487A ............................................................... 7

47 C.F.R. § 25.108 .............................................................................. 7

47 C.F.R. § 25.146(a) ...................................................................... 7, 8

*47 C.F.R. § 25.146(c) ..................................................... 8, 10, 46, 47

47 C.F.R. § 25.289 .............................................................................. 7

## Other Authorities

Circular
    ITU-BR Circular CR/414, Examinations Under Resolution
    85 (WRC-03) (published Dec. 6, 2016),
    https://www.itu.int/md/R00-CR-CIR-0414/en .................................. 56

DISH Opening Br.,
    *Viasat Inc. v. FCC*, 47 F.4th 769 (D.C. Cir. 2022) ........................... 10

ITU Radio Reg. 5.487A ..................................................................... 7

ITU Radio Reg. 13.6 ......................................................................... 56

ITU Resolution 85 (WRC-03) ......................................................... 56

United Nations Office for Outer Space Affairs, *Online Index
    of Objects Launched Into Outer Space*,
    https://www.unoosa.org/oosa/osoindex/search-ng.jspx ....................... 3

*\* Cases and other authorities principally relied upon are marked with asterisks.*

# GLOSSARY

| | |
|---|---|
| 12 GHz band | The portion of the electromagnetic spectrum ranging from 12.2-12.7 GHz |
| Communications Act | Communications Act of 1934, as amended, 47 U.S.C. §§ 151, *et seq.* |
| The Commission or FCC | Federal Communications Commission |
| DISH Petition | Petition of DISH Network Corp. to Dismiss or Deny in Part, File Nos. SAT-LOA-20200526-00055 and SAT-AMD-20210818-00105 (Feb. 8, 2022), Exhibit 1, *Technical Study on SpaceX 2nd Processing Round NGSO FSS Application and its 2021 Amendment* (JA0091-0142) |
| GHz | Gigahertz |
| Order | *In the Matter of Space Exploration Holdings, LLC; Request for Orbital Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System*, Order and Authorization, IBFS File Nos. SAT-LOA-20200526-00055 and SAT-AMD-20210818-00105, Call Sign S3069, FCC 22-91 (rel. Dec. 1, 2022) (JA0016-89) |
| DISH Reply | Reply of DISH Network Corp. to Opposition and Response to Comments of Space Exploration Holdings, LLC, File Nos. SAT-LOA-20200526-00055 and SAT-AMD-20210818-00105 (Mar. 8, 2022), Exhibit 1, *Second Technical Study on SpaceX Second-Generation System* (JA0143-0226) |

## INTRODUCTION

DISH provides satellite-television service to millions of families around the country using 500 MHz of spectrum in the 12 GHz band. That 500 MHz is a small fraction (some 3%) of the frequency bands used by SpaceX's constellation—the largest satellite system the world has ever seen. Satellite television can be jammed (leading to loss of service) if another user transmits into the same frequencies in excess of certain power limits. Avoiding interference is one of the most important Congressional directives to the FCC.

This case is about whether the FCC can reasonably refuse to comply with this directive by failing to evaluate SpaceX's compliance with the power limits meant to protect satellite television (even when the FCC appears to agree with DISH's showing that SpaceX's on-the-record method for demonstrating compliance with the limits is not enough). It is about whether the FCC erred in allowing SpaceX to keep its ultimate showing of purported compliance with these limits outside the record of the proceeding and unavailable to DISH until after the agency made its decision. And it is about whether the agency can delegate the task of evaluating compliance with the power limits to a

closed foreign tribunal, the International Telecommunication Union ("ITU").

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 47 U.S.C. § 402(b)(6).  The Order was released on December 1, 2022, and DISH timely filed its notice of appeal on January 3, 2023.  *See* 47 U.S.C. § 402(c); 47 C.F.R. § 1.4(b)(2).

## STATEMENT OF THE ISSUES

1. Whether the Order was arbitrary and capricious because the FCC failed to consider unrebutted studies that applied the ITU methodology without change and demonstrated that SpaceX's system would exceed the applicable power limits.

2. Whether the Order violated the APA and the FCC's own rules by permitting SpaceX to keep its revised showing of compliance outside the public record and by not requiring SpaceX to provide that showing to DISH and other parties until after the Order was issued.

3. Whether it was arbitrary and capricious to address the problem of SpaceX's behind-closed-doors submission by imposing a meaningless remedy—requiring SpaceX to provide its showing to DISH after issuance of the Order.

4. Whether it was arbitrary and capricious to waive the requirement for SpaceX to obtain a favorable ITU finding of non-interference before initiation of service, the very requirement that supposedly protected consumers and justified the agency's inaction.

5. Whether the FCC violated the subdelegation doctrine.

## STATUTES AND REGULATIONS

The relevant statutes and regulations are reproduced in the Statutes and Regulations Addendum.

## STATEMENT OF THE CASE

### A.     SpaceX's Second-Generation System

This appeal concerns the Commission's grant to SpaceX of authority to deploy its second-generation "Starlink" satellite constellation, to the extent this authority includes use of the 12 GHz band.  DISH primarily uses the 12 GHz band to provide satellite-television service to millions of families nationwide.

The FCC previously authorized SpaceX to launch 4,408 satellites for its first-generation system.  *See Gen1 Order*, 36 FCC Rcd. 7995 (2021).  SpaceX now proposes to add nearly *30,000* more satellites as part of its second-generation system.  Order ¶ 1 (JA0017).  To put these numbers in perspective, the total number of in-orbit satellites worldwide is less than 11,000.[1]

---

[1] United Nations Office for Outer Space Affairs, *Online Index of Objects Launched Into Outer Space*, https://www.unoosa.org/oosa/osoindex/search-ng.jspx (last visited April, 14, 2023).

Such a vast increase in the number of satellites creates a clear and present danger of interference for the millions of families that receive DISH's satellite-television service using the 12 GHz band. Such interference, and loss of service, can occur when a customer's satellite dish receives a competing signal from a different satellite in the same frequency.

Geostationary satellites, such as those operated by DISH, orbit the Earth at the same speed as the Earth rotates. As a result, they remain stationary relative to the Earth and have a continuous sight-line to users within their coverage area. The following graphic illustrates the trip that news, movies and sports broadcasts make from DISH's satellites to these homes.



Non-geostationary satellites, such as those operated by SpaceX, orbit the Earth more quickly than the Earth rotates. To maintain coverage, non-geostationary systems are deployed in "constellations" of hundreds or thousands of satellites. *See Viasat Inc. v. FCC*, 47 F.4th 769, 774 (D.C. Cir. 2022). Below is a map illustrating what the proposed second-generation SpaceX system may look like as its satellites orbit over the United States.

DISH Reply Ex. Figure 14 (JA0189)

## B.    The FCC's Duty to Prevent Interference and the ITU's Role

One of the FCC's main duties is to manage electromagnetic frequencies.  *See* 47 U.S.C. § 303(c).  The FCC allocates each frequency band to one or more services.  In the 1980s, the Commission allocated the 12 GHz band to satellite-television service.  Then, in the 2000s, it also allocated that band to non-geostationary satellite services, but with a crucial proviso:  they are prohibited from causing interference into satellite television.  As the Commission stated then: "Throughout this proceeding, we have focused on the ability of [non-geostationary] operations to coexist with existing operations in several spectrum bands *without causing unacceptable interference to those services.*" *2000 Non-Geostationary Order*, 16 FCC Rcd. 4096 ¶ 166 (2000)

6

(emphasis added).  Thus, under the FCC's rules, "an [non-geostationary] system licensee must not cause unacceptable interference to . . . a [geostationary] . . . network."  47 C.F.R. § 25.289. Further, "non-geostationary-satellite[s]. . . shall be operated in such a way that any unacceptable interference that may occur during their operation shall be rapidly eliminated." 47 C.F.R. § 2.106 n.5.487A; ITU RR 5.487A.

After allocating a frequency band, the Commission issues licenses allowing individual companies to use the spectrum.  Before it can issue or modify a license, the FCC must determine that the proposed service will serve the public interest, including by not causing interference into other spectrum users.  *See* 47 U.S.C. §§ 307(a), 309(a), 316(a)(1).  The Communications Act also requires the Commission "to prevent interference between stations."  47 U.S.C. § 303(f).

To implement this requirement, the Commission has adopted power limits on non-geostationary systems.  *See 2000 Non-Geostationary Order* ¶¶ 170-198; 47 C.F.R. §§ 25.108; 25.146(a).  Only by operating in compliance with these limits is a non-geostationary system "considered as having fulfilled its obligation . . . not to cause

unacceptable interference[.]" *2017 Non-Geostationary Order*, 32 FCC Rcd. 7809 ¶ 32 (2017).  In addressing interference issues, the Commission routinely analyzes complex engineering analyses prepared by the parties.

The ITU is the United Nations agency that administers international frequency allocation, registers satellites, and resolves interference disputes between countries.  The ITU *never* handles disputes between individual companies, is not governed by the Communications Act, and is not subject to judicial review.

The FCC's rules require a non-geostationary applicant seeking to operate in the 12 GHz band to: (1) certify that it will comply with the power limits; and (2) receive a "favorable" or "qualified favorable" finding by the ITU, "[p]rior to the initiation of service," that the system's power levels, calculated using ITU-approved software, do not exceed those limits.  47 C.F.R. §§ 25.146(a), (c).  This rule does not preclude the FCC from evaluating compliance with the power limits by using the ITU software itself.

Indeed, the FCC *must* do so.  The only way for SpaceX to obtain an ITU finding is through a request by its licensing country.  SpaceX's

8

licensing administration for its second-generation system is the United States. This means that the showing of compliance with the limits must be submitted by the FCC, which represents the U.S. in these matters, and therefore the FCC must satisfy itself that the showing is correct.

## C.    SpaceX's First-Generation System

SpaceX applied for authority to construct, build, and operate its first-generation system, consisting of more than 4,000 satellites, in November 2016. DISH requested partial denial of SpaceX's modification of that system in June 2020. DISH submitted an engineering study showing that the applicable 12 GHz band power limits would be exceeded if SpaceX were permitted to serve the same geographic area in the same frequency at the same time with more than one satellite. DISH also submitted two engineering studies showing that, even if SpaceX only focused one satellite on an area, necessary improvements to the ITU method would lead to a showing that the system would exceed the power limits. One of these improvements consisted of replacing hypothesis with reality: ITU software used hypothetical locations for the victim satellite-television

antennas off the coast of Greenland, where DISH does not have customers. DISH's expert instead used real-world locations in the U.S. *See generally DISH Opening Br., Viasat,* 47 F.4th 769.

The FCC granted SpaceX conditional authority in the first-generation order, released on April 27, 2021. The FCC apparently agreed with DISH's view that more than one satellite serving the same area would cause SpaceX's system to exceed the power limits: the order conditioned SpaceX's operations in the 12 GHz band on SpaceX's commitment to a single satellite per frequency per area. *Gen1 Order* ¶ 97(e). This condition was to be largely vitiated by the second-generation Order.

But the FCC declined to address the DISH engineering studies based on improvements to the ITU method, reasoning that "a certification of compliance with EPFD limits is what is required by our rules," and that the "ITU-approved software" is "the relevant analysis." *Id.* ¶¶ 39, 40. The FCC also waived the rule that the agency claimed tied its hands—the requirement that SpaceX obtain a favorable finding by the ITU before the initiation of service, 47 C.F.R. § 25.146(c). Rather, the FCC permitted SpaceX to initiate service prior to the

finding on which the agency supposedly relied for the protection of satellite television.

This Court deferred to the FCC in *Viasat v. FCC,* 47 F.4th 769 (2022), finding that "the governing rules [of the FCC] require interference between [geostationary] and [non-geostationary] systems to be assessed through the method used in the ITU-approved validation software." *Id.* at 776. The Court did not reach the question of whether the delegation of the agency's duties to a closed foreign tribunal was improper, finding that the agency had not been afforded the opportunity to pass on it. The Court also deferred to the FCC's grant of a waiver, but did not explicitly address DISH's argument that it was unreasonable to waive most of the same rule that the agency invoked and by which the agency claimed it was duty-bound.

### D. SpaceX's Second-Generation System

In May 2020, SpaceX submitted an application for its second-generation system ("Gen2"). That application claimed that the proposed system, ballooning to nearly 30,000 satellites, would still comply with the power limits.

11

SpaceX did not provide power level data in support of that claim to DISH until February 4, 2022, four days before the deadline for submitting petitions to deny SpaceX's application.  Therefore, DISH's expert did not run the ITU software for DISH's first study accompanying its Petition, as there was no time to do so.  Instead, that first study compared the power levels claimed by SpaceX for the second-generation system with the characteristics of the first-generation system, and concluded "[i]t is inconceivable that the . . . results for the Gen2 constellation could be better than those of the Gen1" system, in light of the increase in maximum power characterizing the second-generation system.  DISH Pet. Ex. at 1 (JA0123).  SpaceX never rebutted that showing.

With the benefit of the supporting data, DISH's expert engineer prepared a second study, which DISH submitted into the record with its reply.  Using SpaceX's own data—*and without making any changes to the ITU software parameters or methodology*—this study concluded that SpaceX's system would not comply with the power limits required by Commission rules.  The study revealed that SpaceX circumvented these limits by artificially splitting its system into 18 separate parts.

12

DISH Reply Ex. at 1 (JA0171).  As DISH pointed out, this is like qualifying for the 100-meter dash by running one eighteenth of the distance in under 10 seconds (a time possibly achievable even by the undersigned counsel), becoming a bantamweight by splitting a heavyweight boxer's weight 18 ways, or satisfying a $100 limit on meal expenses by splitting a $1700 dinner bill into 18 parts.  And, while each of the 18 sub parts *individually* would come close to violating the power limits, the constellation would blow past these limits when the joint effect of these subparts is considered.

### E.    SpaceX's (Absent) Engineering Studies

SpaceX did not dispute the findings of DISH's studies.  Nor did SpaceX submit any engineering studies of its own.  Instead, SpaceX argued that its system complied with the rules if each of the 18 sub-parts complied with the limits *when viewed individually*, even if the system as a whole did not.  As explained below, the FCC appears to have recognized that SpaceX's 18-way split was inadequate.

Apparently realizing from its interactions with the agency that the 18-way split showing was insufficient, SpaceX then tried another method.  In a letter filed with the FCC on October 27, 2022, SpaceX

revealed that it had "recently submitted [to the FCC] combined EPFD data files to the Commission for its entire Gen2 system," and that "such files, when analyzed with the ITU-approved validation software, comply with the applicable EPFD limits."  SpaceX Oct. 27, 2022 Letter at 2 (JA0234).  This was news to DISH.  DISH asked the FCC to require SpaceX to supply the information, not only to the FCC privately, but in the public record of the proceeding, and to give parties an opportunity to respond.  DISH Nov. 16, 2022 Letter at 1 (JA0238).

SpaceX also requested diluting the single-satellite, per-frequency-per-area condition imposed on its first-generation system.  SpaceX asked that its second-generation system become subject to its own separate single-satellite condition, meaning that an area could be served at the same time by up to *two* SpaceX satellites, one from each generation.  DISH objected, pointing out that the condition sprang from the concern that, if more than one satellite served the same area in the same frequency, the power limits would be exceeded.  SpaceX's request for two "single-satellite" caps would allow two satellites to converge on the same area and hence only raise the concern the FCC had sought to remedy.

14

F.    The Order

In the Gen2 Order, the Commission partially granted SpaceX's second-generation application.  The Commission found SpaceX's self-certification that it will comply with applicable power limits sufficient to allow SpaceX to begin operating its second-generation system.  Order ¶ 31 (JA0038).  In doing so, the Commission "decline[d] to consider the additional analyses submitted by DISH," claiming incorrectly these analyses "us[e] software modified to evaluate EPFD compliance at different locations than the ITU-approved software."  *Id.* ¶ 27 (JA0036). The Order also violated the FCC's own rules and the APA by refusing to allow DISH to review key SpaceX data before the Order was released, only letting DISH review the data once the Order was a *fait accompli*. *See id.* ¶ 34 (JA0040-41).

The FCC refused to evaluate for itself whether the second-generation system complies with the power limits, *id.* ¶ 27 (JA0036) or to consider DISH's second Gen2 study—which followed the ITU's method precisely.  *Id.* ¶ 30 (JA0037-38).  The FCC also permitted SpaceX to begin operating its second-generation system before receiving a favorable finding from the ITU.  *Id.* ¶ 40 (JA0043-44).  The agency

moreover converted the single-satellite-per-frequency-per-area-condition into a two-satellite condition instead, allowing one satellite from each SpaceX system to serve the same area at the same time. *Id.* ¶ 36 (JA0041-42).

The FCC seemed to agree with DISH that it was not enough for SpaceX to show that each of the 18 subparts of its system produced less power than the limits. On the one hand, the FCC found the split was "reasonable" and not "intended to manipulate the ITU process." *Id.* ¶ 31 (JA0038). On the other, contrary to SpaceX's arguments, the Order required SpaceX to "obtain a finding from the ITU that explicitly indicates the ITU has considered the *joint effect*" of its combined system. *Id.* (JA0038) (emphasis added). The Order also characterized "the requirement for SpaceX to provide its combined EPFD datafile to interested parties" as an "important protection to [geostationary orbit] operations from harmful interference." *Id.* ¶ 34 (JA0040). The agency left it unclear how a SpaceX data submission was supposed to protect such operations.

The FCC denied DISH the opportunity to review and comment on SpaceX's second showing of compliance with the power levels, on the

ground that the agency did not consider the substance of that showing. *Id.* (JA0040-41) ("[W]e thus reject parties' requests for access to those data, and for time to evaluate them, prior to our issuance of this Order.").

The Order did require SpaceX to provide its privately submitted second showing of compliance to DISH. *Id.* ¶ 33 (JA0039-40) ("SpaceX must make available to any requesting party the data used as input to the ITU-approved validation software to demonstrate compliance with applicable limits, including the data that combine the Gen2 satellites into one consolidated file."). This was obviously too little, too late to affect the Commission's decision. Nor did the FCC state that it would reconsider the Order if DISH or other parties were to dispute that showing.

SpaceX is now authorized to launch and operate up to 7,500 second-generation satellites that are highly likely to interfere with service to DISH's millions of satellite-TV customers. As SpaceX launches more and more satellites in the coming months and years, the risk of interference into DISH's television service will continue to worsen.

## SUMMARY OF ARGUMENT

The Order leaves millions of families receiving satellite television service from DISH in the 12 GHz frequency band vulnerable to interference.

*Unreasoned Decisionmaking*.  The FCC cannot continue to wash its hands of the interference avoidance duties entrusted to the agency by Congress.  The FCC was not bound to ignore DISH's evidence by its rule requiring certification by the applicant and ITU review before service commences.  In contrast with *Viasat*, here the agency was not being asked to improve the ITU method, something that this Court found the agency could refuse to do within its authority.  The FCC was being asked to *apply* that method, without any improvement or changes.  And still the FCC did not—indeed, the Order claims that DISH's analyses used "modified" ITU software, Order ¶ 27 (JA0036), only to recognize that DISH used that software unmodified three paragraphs later. *Id.* ¶ 30 (JA0037-38).

The FCC's failure to analyze SpaceX's power limit compliance was all the more serious because the agency disagreed with SpaceX's argument that it is enough to show each of 18 subsystems into which it

artificially split its system complies with the limits individually, even if the entire system does not.  To the contrary, the FCC appeared to agree with the basis of DISH's studies—that the "joint effect" of the second-generation system should be considered in calculating power levels and assessing compliance with the limits.  *See id.* ¶ 31 (JA0038).  But the Commission still ignored DISH's conclusion that, when its joint effect is considered, the system exceeds the limits.  The FCC also disregarded the logical inference from SpaceX's initial attempt to split its system 18 ways—without the split, power limits would be exceeded.  *Id.* (JA0038).

*Meaningless Remedy For Behind-Closed-Doors Submission*.  Worse still, when SpaceX submitted a revised showing of compliance with the power limits privately to the agency (this time without relying on a split of the system), the FCC allowed SpaceX to keep it outside the record of the proceeding.

The FCC compounded its error when it denied DISH the opportunity to comment on SpaceX's "joint effect" submission on the ground that the FCC received but did not "consider the substance" of the files.  *See id.* ¶ 34 (JA0040).  Among other errors, the agency *was bound* to "consider the substance" of SpaceX's second showing, since it

19

seemed to conclude that SpaceX's first showing was reasonable but inadequate. *Id.* ¶ 31 (JA0038). Moreover, regardless of how the FCC used the files, DISH had a right to review them under the agency's own rules, which afford parties access to any "communication directed to the merits or outcome of a proceeding." 47 C.F.R. § 1.1202(a).

The Order did require SpaceX to provide the data to DISH after-the-fact, suggesting that, even in the agency's view, there was something wrong about the ex parte private nature of the submission that needed to be remedied. *See* Order ¶ 34 (JA0040-41). But the remedy was meaningless. The Order left DISH with no mechanism to obtain reconsideration by the FCC of the decision, no matter how flawed Space's revised submission may be.

*Waiver of the Very Protection the FCC Relied on to Justify Its Inaction.* The requirement of pre-service ITU review also went out the window. The FCC acted arbitrarily by waiving the very same rule on which it apparently relied in disregarding DISH's evidence of interference. After stating that "we continue to rely on the ITU's review," and after asserting emphatically that conditioning SpaceX's authorization on an ITU finding constitutes a "protection" for DISH, *id.*

20

¶¶ 31, 34 (JA0038, 0040), the FCC waived the requirement and permitted SpaceX to start service before the ITU review anyway. *Id.* ¶ 40 (JA0043-44).

*Improper Delegation and Infringement of Appeal Rights*. The ITU process provides no excuse for the FCC to not fulfill its duties. The Order is an unlawful delegation of the agency's responsibilities to the ITU, and also violates DISH's rights under the Communications Act, 47 U.S.C. § 402(b)(6), to appeal against a possible finding of non-interference.

Delegation to the ITU in the absence of any agency oversight is improper. In fact, the Order's delegation is not even consistent with SpaceX's own advocacy in this proceeding. Even SpaceX contended that the Commission "could review the analysis presented by SpaceX using the ITU-approved validation software to assess compliance with those limits, or even run its own analysis on the underlying EPFD data files." SpaceX Oct. 17, 2022 Letter at 5 (JA0231).

The delegation is all the more improper because it deprives DISH of any recourse to this Court if the ITU makes a favorable finding and gives SpaceX its belated stamp of approval even though the system

exceeds the power limits. These important questions were explicitly left unaddressed by this Court for procedural reasons, *see Viasat*, 47 F.4th at 778, but cannot be disregarded here.

## STANDING

DISH has constitutional standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The SpaceX system authorized by the Order will likely cause interference with DISH's transmissions to its customers, thereby injuring DISH's business. The Order is causally responsible for the harm because it allows SpaceX to operate in a manner that will exceed the applicable power limits. And successful review would prevent SpaceX from violating the applicable power limits.

As for prudential standing, DISH is a "person who is aggrieved or whose interests are adversely affected" by the Order, 47 U.S.C. § 402(b)(6), and participated in the proceeding below to avert these effects. *See, e.g.*, DISH Petition to Deny (JA0093-0142); *Viasat*, 47 F.4th at 776, n.1.

# ARGUMENT

## I.  The Order Is Arbitrary and Capricious

The fundamental obligation of a federal agency is to act only on the basis of reason, with due consideration for all facts relevant to the matter before it.  The Commission defaulted on that obligation here. The Commission did not dispute the technical evidence showing the second-generation system would exceed the power limits, threatening unlawful interference with DISH's customers' reception of television service.  Rather, the agency simply *refused to consider* that evidence, relying instead on either no evidence at all, or at most, SpaceX's own self-certification based on calculations DISH was not allowed to review until after the Order was released.  The FCC refused even though DISH had applied the ITU method without change; it refused even though the agency has evaluated compliance with the limits based on application of the ITU method before and taken actions to prevent noncompliance with these limits; and it refused even though SpaceX's initial attempt to show compliance by splitting its system 18 ways betrayed a concern on SpaceX's part—that the entire system's joint effect would exceed the limits.  The Commission then proceeded to waive the sole remaining safeguard that might have provided a check on SpaceX's compliance

23

with the limits by allowing SpaceX to bypass 47 C.F.R. § 25.146 and begin operating the second-generation system immediately. In light of the Commission's dereliction of its duties, this Court should vacate the Order with respect to the 12 GHz band.

### A. The Arbitrary-and-Capricious Standard of Review

In a 47 U.S.C. § 402(b) appeal from an order of the Commission, this Court considers, under the familiar standards of the APA, "whether the Order is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *PSSI Global Servs., LLC v. FCC*, 983 F.3d 1, 7 (D.C. Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). An agency action is arbitrary "if the agency relied on inappropriate factors, failed to consider important aspects of the problem, or ignored relevant evidence." *Viasat*, 47 F.4th at 776.

The "APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). The Court must "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* "[T]he

24

agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

The Court must "consider whether the decision was based on a consideration of the relevant factors." *Id.* "Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* This Court therefore "ensure[s] that the [agency] examine[d] the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 4 (D.C. Cir. 2022). This Court "will generally defer to the Commission's interpretation of its own precedent," but not "when the Commission departs from those rulings without providing a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *City & Cnty. of San Francisco v. FERC*, 24 F.4th 652, 661, 664 (D.C. Cir. 2022) (noting the

25

agency "did not adequately explain any operational or engineering rationale").

## B. The Commission Disregarded Undisputed Evidence That SpaceX's Operations Will Exceed the Power Limits

The FCC granted SpaceX's application without reasonably considering—indeed, without considering at all—DISH's expert evidence that went to the central issue raised by SpaceX's application. That evidence, which used the methodology required by this Court's *Viasat* decision, showed that SpaceX's second-generation constellation would plow through the FCC's power limits. The Commission committed a textbook example of arbitrary agency action by avoiding this evidence.

In its second study, DISH showed that the second-generation system would "clearly violate" applicable power limits using SpaceX's own technical data. DISH Reply Ex. at 1 (JA0171); Order ¶ 30 (JA0037-38) (summarizing findings). Notably, DISH's second study used the ITU methodology *without any modifications*, in accordance with *Viasat*. DISH Reply Ex. at 2 (JA0172); *Viasat*, 47 F.4th at 776 (The FCC was not required to consider studies that "use[d] a different method for assessing interference than what binding regulations

26

require.").  Yet the Order disregarded the evidence.  While it is hard to glean the reasons, one of them is not only incorrect, but acknowledged by the FCC itself to be incorrect elsewhere in the Order.  The FCC "decline[d] to consider the additional analyses submitted by DISH and Viasat analyzing Gen2 Starlink using software modified to evaluate EPFD compliance at different locations than the ITU-approved software."  Order ¶ 27 (JA0036).  The problem is that this was untrue of the *DISH* analysis—DISH's second Gen2 study had used the ITU software without change; and DISH's first Gen2 study (which was cited by the FCC for the modified software proposition) had not used the software at all, because SpaceX had not provided the data files necessary to run it in time.  In any event, a mere three paragraphs later, the FCC recognized that DISH "analyzed SpaceX's compliance . . . by running SpaceX's input datafiles through the ITU-approved software without any modifications."  *Id.* ¶ 30 (JA0037).

But, having acknowledged the point, the FCC neither agreed nor disagreed with the second study's conclusion of non-compliance.  While the reasons are again unclear, the FCC seemed to believe that it provided sufficient "protections" for geostationary operators that the

agency did not need to get its hands dirty with analysis. One such protection was "the requirement for SpaceX to provide its combined EPFD datafile to interested parties," *id.* ¶ 34 (JA0040), a requirement that, as will be seen, provides cold comfort. Another "protection" was also inherently unreliable: "SpaceX's certification of compliance with the EPFD limits." *Id.* ¶ 31 (JA0038). Specifically, because the second Gen2 study analyzed SpaceX's 18-way split, it seemed to be superseded in the FCC's view by SpaceX's self-certification that it would comply with the limits based on *combined* data (to which only the Commission and SpaceX had access). *Id.* (JA0038) ("SpaceX confirms that this combined filing demonstrates compliance with all applicable EPFD limits.").

This rationale does not withstand scrutiny. DISH's second Gen2 study showed categorically (and based on the unmodified ITU method) that the combined effect of SpaceX's proposed system would blow right through the applicable power limits. DISH Reply Ex. at 36 (JA0206). SpaceX's certification to the contrary based on data that no other party was permitted to see prior to the issuance of the Order cannot, without any further explanation, supersede evidence submitted on a timely

28

basis showing exactly the opposite of SpaceX's self-certification. Even less credible would be an argument that the FCC could have relied on SpaceX's self-certification without considering *either* DISH's studies or the SpaceX ex parte data as supporting that self-certification.

Self-certification is not a panacea for curing the system's incompatibility with the power limits. *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) ("In basing its explanation for the renewal decision in part on the basis of . . . self-certification, the agency's explanation for its decision runs counter to the evidence allegedly before it."). Confronted with unrebutted evidence that the combined 18 subfiles would violate the EPFD limits, the Commission cannot simply put on blinders and ignore the issue. *Missouri Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003) ("Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking."). Here, the unrebutted record evidence showed that the second-generation system would violate the power limits even using the ITU's software without modifications. *See, e.g.,* DISH Reply Ex. at 36 (JA0206). The FCC

erroneously ignored this evidence and relied solely on SpaceX's flawed self-certification, which made its decision arbitrary and capricious.

Apart from this overarching deficiency, there are multiple issues with the Commission's refusal to address DISH's second Gen2 study.

*First*, as even the Order acknowledged, DISH's second study in this proceeding cannot be excluded on the ground that it did not use the ITU methodology, as was the case in *Viasat*, 47 F.4th at 776 ("[T]he governing rules require interference between [geostationary] and [non-geostationary] systems to be assessed through the method used in the ITU-approved validation software."). Despite "recogniz[ing] the differences in the issues raised by the record before us in this proceeding," Order ¶ 30 (JA0037), as compared to the *Viasat* case, the Order nonetheless failed to consider DISH's findings, contrary to this Court's precedent. *See Constellation Mystic Power, LLC v. FERC,* 45 F.4th 1028, 1054-55 (D.C. Cir. 2022) ("When an agency does not respond to arguments that do not appear frivolous on their face and could affect the agency's ultimate disposition, we remand for agency consideration. We do so because the failure to respond meaningfully to objections

raised by a party renders the Commission's decision arbitrary and capricious.") (cleaned up).

*Second,* reasoned decisionmaking requires consistency, which in turn requires consideration of DISH's evidence. The FCC's approval of SpaceX's first-generation system was conditioned on SpaceX's commitment to a single satellite per frequency per area. *Gen1 Order* ¶ 97(e). The only reason to impose that condition was the view that, with more than one satellite serving the same area, the system would exceed the limits, a view necessarily based on the ITU method. The FCC cannot be competent to consider the ITU method in some areas and powerless in others.

*Third*, to the extent the Commission relied on SpaceX's ex parte filing of combined file data run through the ITU methodology to support its decision to permit SpaceX to go forward with a portion of its proposed system, it failed to follow its own rules. And, in doing so, it denied DISH's right to be heard on the critical issue in the case. Merely closing the barn door after the horses have left does not remedy this truncated and one-sided process. As part of the requirement that SpaceX "obtain a finding from the ITU that explicitly indicates the ITU

31

has considered the joint effect of SpaceX's multiple ITU filings," Order ¶ 31 (JA0038), the Commission also required SpaceX to make available to DISH the combined files SpaceX relied on for its self-certification: "SpaceX must make available to any requesting party the data used as input to the ITU-approved validation software to demonstrate compliance with applicable Equivalent Power Flux Density (EPFD) limits, including the data that combine the Gen2 Starlink satellites into one consolidated file." *Id.* ¶ 135(t) (JA0085). But that belated requirement cannot cure the due process issue that was already created by the Commission's apparent reliance on secret data that no other party had a timely chance to review or rebut.

Indeed, the due process issue is a continuing one that extends into this appellate proceeding. Because the Commission did not require the secret data to be disclosed before issuance of its Order, these data are not part of the administrative record nor are they open to rebuttal by DISH. Having reviewed the secret data after their post-Order disclosure, there are areas on which DISH would vigorously contest SpaceX's presentation if the opportunity were presented to it on vacatur/remand. However, for present purposes, it is enough to note

that DISH's rights are impaired in this appeal as much as in the

proceeding below because of the Commission's apparent reliance on

undisclosed data to support its decision.

Nor can the FCC avoid the due process issue by contending that it

did not actually rely on the secret ex parte data to support its decision

because it shifted the ultimate decision about whether SpaceX's system

would exceed the applicable power limits to the ITU.  If the Commission

did not rely on the secret data for its decision, then it effectively had no

basis for its decision apart from an unsupported declaration from

SpaceX that it will be able to meet the power limits when the issue is

determined by the ITU at some uncertain future point.  Given the

Commission's explicit mandate from Congress to prevent interference

with existing services in a particular band when new entrants seek to

use the same band, the Commission cannot simply look the other way

while a new service is launched that has *never* been found by *any*

decisionmaker to be free from harmful interference to other users of the

spectrum.  *See* 47 U.S.C. § 303(f).  And the call of duty is particularly

resounding here: SpaceX devoted most of its energy throughout the

proceeding to arguing that it was all right to split its system 18 ways

33

and show that each part transmitted less power than the limits.  It was obvious from that insistence that, without the split, SpaceX's showing would be in trouble.  And it was.  The combined files do not represent some *de minimis* change.  As DISH demonstrated after it finally received those files, SpaceX substantially changed parameters of the second-generation system, including which of its satellites would be considered as contributing the power limits.  DISH March 6, 2023 Letter at 1 (JA0248).

The Commission is thus on the horns of a dilemma.  If it did rely on the secret ex parte evidence to support its decision, then due process clearly requires a vacatur for DISH to have the opportunity to review and comment on the evidence the Commission relied on.  If the Commission did not rely on that evidence, then its decision is simply unsupported.  Worse still, it flies in the face of the only credible evidence that is found in the record, which is DISH's study demonstrating under the ITU's own methodology that SpaceX will not be able to meet the power limits test when the ITU ultimately makes its decision.  *See State Farm*, 463 U.S. at 43 ("[A]n agency rule would be arbitrary and capricious if the agency . . . offered an explanation for its

decision that runs counter to the evidence."); *Constellation Mystic Power,* 45 F.4th at 1042 (APA review includes "ensuring the Commission can demonstrate that its decision is supported by substantial evidence in the record.").

The Commission has thus made it impossible for this Court to review its decision.  A foundation of appellate review embodied in the APA is that courts review the "whole record."  5 U.S.C. § 706; *see also Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.").  Courts must have access to the whole record so that they can determine whether the agency's decision was reasonable. *See* 28 U.S.C. § 2112(b) ("The record to be filed in the court of appeals … shall consist of the order sought to be reviewed or enforced, the *findings* or report upon which it is based, and the pleadings, *evidence*, and proceedings before the agency … concerned.") (emphases added); *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1087 (D.C. Cir. 2021); *Rodway v. U.S. Dep't of Agric.*, 514 F.2d

809, 817 (D.C. Cir. 1975).  As both the Commission and this Court have

explained:

> even the possibility that there is . . . one administrative record
> for the public and this court and another for the Commission and
> 'those in the know' is intolerable . . . undocumented discussions
> are inconsistent with fundamental notions of fairness implicit in
> due process and with the ideal of reasoned decisionmaking on
> the merits which undergirds all of our administrative law[.]
> *Amendment of Ex Parte Rules Order*, 26 FCC Rcd. 4517 ¶ 15
> (2011) (quoting *Home Box Office v. FCC*, 567 F.2d 9 (D.C. Cir.
> 1977) (cleaned up).

Where an agency acts in such an arbitrary and capricious manner, this

Court intervenes.  *See Viasat*, 47 F.4th 776 ("[A]n agency abuses its

discretion when it arbitrarily violates its own rules, not when it follows

them.").

Perhaps recognizing the untenability of its position, the

Commission offered a false fig leaf of compromise: it allowed SpaceX to

certify compliance based on these undisclosed files but also required

SpaceX to provide the files to a requesting party after some unspecified

period. Order ¶ 135(t) (JA0085).  This type of *post hoc* "correction" is

inadequate under the APA: the Commission cannot rely on private

parties having access to the files *after issuance* of its Order to remedy

the Commission's error in relying on the secret files *in issuing* that Order.

Where, as here, an agency fails to reasonably consider relevant data, its action is arbitrary and capricious and is not entitled to the judicial deference owed where an expert agency actually considers the technical data before it. *See, e.g.*, *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review.") (citing *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010)).

This Court has previously rejected similar attempts by agencies to summarily dismiss relevant data. In *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008), for example, the Court faulted the Commission for "offer[ing] no reasoned explanation for its dismissal of empirical data that was submitted at its invitation." *Id.* at 241. The Court recognized that, where evidence is of a "critical nature," a conclusory "statement cannot substitute for a reasoned explanation, for it provides neither assurance that the Commission considered the

37

relevant factors nor a discernable path to which the court may defer[.]" *Id.* (cleaned up).  Here, the Commission did not even provide a "conclusory statement" about the studies—much less the "reasoned explanation" required.

Just as in *American Radio Relay League*, this Court simply cannot determine whether the Commission rationally considered the risk for interference that DISH demonstrated, because the Commission provided no indication it had done so.  The Commission's utter failure to consider the relevant studies was arbitrary and capricious and requires vacatur.[2]

---

[2] *See also Genuine Parts*, 890 F.3d at 313 (finding arbitrary and capricious agency's decision to ignore studies that did not support its position); *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706."); *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (The Commission "failed to examine the relevant data and articulate a satisfactory explanation for its action") (cleaned up); *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 525 (D.C. Cir. 2009) (agency "too hastily discounted" studies); *Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005) ("[T]he agency decisionmaker *entirely ignored* relevant evidence.") (emphasis in original); *Robinson v. NTSB*, 28 F.3d 210, 216 (D.C. Cir. 1994) (agency may not ignore evidence relating to critical fact in case); *ALLTEL Corp. v. FCC*, 838 F.2d 551, 558 (D.C. Cir. 1988) ("[T]he Commission must do more than simply ignore comments that challenge its assumptions and must come forward with some explanation that its view is based on some reasonable analysis.").

The Supreme Court's decision in *Prometheus* is instructive.
There, parties submitted data regarding minority and female ownership
of media outlets, which the Commission reviewed before concluding that
relaxation of ownership rules was appropriate.  *Prometheus*, 141 S. Ct.
at 1158-59.  Prometheus challenged the Commission's conclusion,
arguing "that countervailing—and superior—evidence was in fact in the
record[.]"  *Id.* at 1159.  The Supreme Court concluded that "[t]he FCC
did not ignore the . . . studies" but "simply interpreted them differently."
*Id.*

Here, by contrast, the Order does not engage in any
interpretation.  In fact, the Order fares even worse under the APA's
lens than if the Commission had engaged in a mistaken interpretation.
If that had happened, the interpretation would be entitled to respect
and would not be set aside unless it was not only mistaken but "so
implausible that it could not be ascribed to a difference in view or the
product of agency expertise."  *State Farm*, 463 U.S. at 43.  Here,
however, the Order made no factual findings for the Court *to* respect.

Because the Commission did not "reasonably consider[] the
relevant issues and reasonably explain[] the decision," the Order must

be set aside with respect to the 12 GHz band.  *Prometheus*, 141 S. Ct. at

1158.

### C.    The Order Violated the FCC's Own Rules

Contrary to the statement in the Order that the files were exempt

from disclosure because the Commission did not "consider[] the

substance of the combined data file," Order ¶ 34 (JA0040), DISH had a

right to review the material under the FCC's rules regardless of how the

FCC used the files.  *See* 47 C.F.R. § 1.1202(a).  As the Commission has

explained, "open and transparent decision-making requires that

interested parties, and the public, have complete information about who

is engaging in ex parte discussions in pending proceedings and what

arguments and showings are being made." *Amendment of Ex Parte

Rules Order* ¶ 21.

The FCC designated the SpaceX Gen2 proceeding as "permit-but-

disclose" under the FCC's ex parte rules.[3]  This means that

"presentations" to FCC personnel are permissible, but subject to certain

disclosure requirements.  47 C.F.R. § 1.1206.  A "presentation" means

---

[3] *See* Satellite Policy Branch Information, Actions Taken, Report No.
SAT-01571 (July 30, 2021) (JA0090).

"[a] communication directed to the merits or outcome of a proceeding, including any attachments to a written communication or documents shown in connection with an oral presentation directed to the merits or outcome of a proceeding." 47 C.F.R. § 1.1202(a). Under the FCC's rules, "if the presentation is made in a proceeding subject to permit-but-disclose requirements, disclosure of any new written information elicited from [a staff request] . . . must be made in accordance with the requirements of § 1.1206(b)[.]" 47 C.F.R. § 1.1204(a)(10)(iii). Section 1.1206(b), in turn states: "[d]ocuments shown or given to Commission staff during ex parte meetings are deemed to be written ex parte presentations and, accordingly, must be filed consistent with the provisions of this section." 47 C.F.R. § 1.1206(b)(2)(i).

Here, SpaceX's submission was directed to both the merits and outcome of the proceeding. According to SpaceX itself, "such files, when analyzed with the ITU-approved validation software, comply with the applicable EPFD limits." SpaceX Oct. 27, 2022 Letter at 2 (JA0234). The very legality of SpaceX's proposed system in turn depends on such compliance. The secret data thus involved the central question of the proceeding for the 12 GHz band, not some peripheral issue.

In any event, under precedent of this Court, the Order has been "irrevocably tainted" to DISH's detriment. *Prof. Air Traffic Controllers Org. v. FLRA.*, 685 F.2d 547, 564 (D.C. Cir. 1982) ("[A] court must consider whether, as a result of improper ex parte communications, the agency's decisionmaking process was irrevocably tainted so as to make the ultimate judgment of the agency unfair, either to an innocent party or to the public interest that the agency was obliged to protect."). This Court has found that agency proceedings that have been blemished by improper ex parte communications are voidable. *See Home Box Office*, 567 F.2d at 58. Several considerations are relevant to this determination: (1) the gravity of the ex parte communications; (2) whether the contacts may have influenced the agency's ultimate decision; (3) whether the party making the improper contacts benefited from the agency's ultimate decision; (4) whether the contents of the communications were unknown to opposing parties, who therefore had no opportunity to respond; and (5) whether vacation of the agency's decision and remand for new proceedings would serve a useful purpose. *Prof. Air Traffic Controllers*, 685 F.2d at 564-65.

These factors are all met here.  As to gravity, if the FCC did not consider the substance of SpaceX's showing, it needed to.  There is no graver risk posed by an application to use the 12 GHz band than the possibility the system will exceed the power limits.  It was that risk that the FCC was trying to avert by imposing the single-satellite condition.  *See Gen1 Order* ¶ 97(e).  It was that risk that SpaceX was trying to obfuscate by dividing its system into 18 parts.  The FCC's asserted failure to "consider the substance" of SpaceX's second and final showing of compliance was all the more troubling since the Order attaches decisional significance to it, quoting approvingly SpaceX's "confirm[ation] that this combined filing demonstrates compliance with all applicable EPFD limits."  Order ¶ 31 (JA0038).  For this confirmation, the FCC cited SpaceX's statement that the "combined EPFD data files, when analyzed with the ITU-approved validation software, comply with the applicable EPFD limits."  *Id.* ¶ 31 n.151 (JA0038) (citing SpaceX Oct. 27, 2022 Letter).  To compound the unreasonableness, SpaceX retracted that confirmation after making it, claiming that it had made the private submission to the FCC for virtually no reason at all: "SpaceX does not intend to submit these files

43

to the ITU for validation and does not argue they are relevant to determining the Gen2 system's compliance with EPFD limits."  SpaceX Nov. 10, 2022 Letter at 1 (JA0235).  That strange retraction should have served as another red flag—it suggested a suspicious desire on SpaceX's part to keep the submission out of the public eye.  But the FCC was apparently, and unreasonably, content both to ignore SpaceX's retraction of the confirmation and to not review the confirmation's substance.

Finally, the remaining three factors weigh heavily in favor of a finding that the Order has been irrevocably tainted to DISH's detriment.  SpaceX benefited from the Order, which authorized up to 7,500 second-generation satellites.  The contents of the data files were not known to DISH or any of the other parties.  Vacating the Order and remanding would serve a useful purpose, both by remediating the prejudice to DISH from not being able to analyze the data and by enabling the Commission to make a reasoned decision after considering DISH's evidence demonstrating that the power limits would indeed be exceeded.

### D.     The FCC Contradicts Itself by Relying on Rules It Waived

The FCC arbitrarily contradicted itself by waiving the very rules that it relied on in ignoring DISH's interference analysis, thereby exposing DISH to interference while simultaneously seeing the need to adopt "protections" against the same harm.  Such internal incoherence is a classic species of unreasonable decisionmaking.  *See Prometheus*, 141 S. Ct. at 1158.

Instead of relying on its own engineering expertise or considering DISH's evidence, the FCC entirely delegated its responsibility to prevent harmful interference to the ITU.  *See* Order ¶ 27 (JA0035-36) ("[W]e decline to reconsider our rule relying on ITU review for evaluating compliance with EPFD limits[.]").  Thus, the Commission relied on its rules, which require SpaceX to certify compliance with the power limits required by the FCC and obtain ITU approval, to ignore DISH's unrebutted showing that SpaceX would violate these limits.  *See id.* ¶ 31 (JA0038) ("SpaceX's certification of compliance with the EPFD limits, along with the conditions we adopt herein, including the requirement to obtain a finding from the ITU that explicitly indicates the ITU has considered the joint effect of SpaceX's multiple ITU filings,

45

would ensure that SpaceX's Gen2 Starlink system will comply with the EPFD limits which should protect [geostationary] operations from harmful interference.").

Yet the Order then waived the crucial portion of the same rules—the requirement that SpaceX obtain ITU approval before initiating service. *Id.* ¶ 40 (JA0043-44); 47 C.F.R. § 25.146(c). The Commission sought to justify this waiver by imposing conditions that require SpaceX to receive ITU approval based on its combined data files and to provide those files to interested parties. *See* Order ¶¶ 32, 34, 40 (JA0039, 0040-41, 0043-44).

This is arbitrary reasoning because the Commission's decision to condition SpaceX's authorization on an ITU finding that refutes DISH's evidence shows that the Commission recognizes a possibility of harmful interference. In the Commission's own words, the condition for ITU approval based on SpaceX's combined files "provide[s] important protections to [geostationary] operations from harmful interference." *Id.* ¶ 34 (JA0040). This could only be true if the Commission sees a potential for SpaceX's constellation to cause harmful interference. If not, then the condition would not provide any protection, as there would

46

be no potential for harm.  The Commission's view of the condition as a necessary and appropriate protection cannot be reconciled with its waiver and its refusal to consider DISH's evidence.  If the condition truly protects geostationary operators, then SpaceX should not have received a waiver, because there is a real threat of interference.  The only thing that could stop that interference from harming DISH would have been the Commission's rule requiring that SpaceX receive ITU approval before commencing operations.  *See* 47 C.F.R. § 25.146(c).

The Order thus contains a fundamental inconsistency: the relegation of the interference finding to the ITU is irreconcilable with a waiver of the obligation to obtain the finding until *after* service has commenced.  At that point, millions of homes may have lost their television service or suffered its interruption.  With one hand, the Order undoes the safeguard, ineffective though it may be, that it put in place with the other.  And the Order does not even give SpaceX a deadline by which to request or receive the ITU finding.  The grant of the waiver was arbitrary and capricious, an abuse of discretion, and contrary to law.

## II.    The FCC Unlawfully Subdelegated Its Authority

"[W]hen an agency delegates power to outside parties, lines of accountability may blur, undermining an important democratic check on government decision-making." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 926 (D.C. Cir. 2008) (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("*USTA*")).  To prevent this, this Court has held that "federal agency officials . . . may not subdelegate to outside entities—private or sovereign—absent affirmative evidence of authority to do so."  *USTA*, 359 F.3d at 566; *see also La. Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 696 (D.C. Cir. 2017).

The unlawful subdelegation doctrine is premised on a presumption about Congressional intent: "A general delegation of decision-making authority to a federal administrative agency does not, in the ordinary course of things, include the power to subdelegate that authority beyond federal subordinates." *USTA*, 359 F.3d at 566.  Such a subdelegation is therefore not entitled to *Chevron* deference. *Id.*

The Order violated this bedrock principle when it unlawfully ceded to the ITU its own expansive policymaking authority in the field of interference.

48

This Court reviews these claims *de novo* because they turn on the interpretation of a federal statute on a matter as to which agencies do not receive deference.  *See USTA*, 359 F.3d at 566 (no *Chevron* deference regarding agency power to subdelegate authority to outside parties); *see also La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 551 (5th Cir. 2014) (holding that subdelegation challenges are reviewed *de novo*).  The *Viasat* Court did not consider the delegation issue for procedural reasons that are not present here.  *See Viasat*, 47 F.4th at 778.

No provision of the Communications Act gives the FCC the express authority to subdelegate to the ITU its duty to prevent interference.  While Congress gave the Commission power to craft regulations to prevent interference, *see* 47 U.S.C. § 303(f), that "general delegation of decision-making authority to a federal administrative agency does not . . . include the power to subdelegate that authority beyond federal subordinates."  *USTA*, 359 F.3d at 566.  Because the statute fails to give the ITU any express role in determining whether interference exists, subdelegation to the ITU is prohibited.  *See id.*

49

The ITU's status as an international body does not make delegation to it less pernicious than a delegation to a private party. Delegating powers to the ITU passes decisionmaking to a body many steps removed from the average voter. That is one reason why "[t]here is significant debate over the constitutionality of assigning lawmaking functions to international bodies." *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 9 (D.C. Cir. 2006).

The Order's delegation is also inconsistent with SpaceX's own advocacy in this proceeding, where SpaceX claimed that the Commission "could review the analysis presented by SpaceX using the ITU-approved validation software to assess compliance with those limits, *or even run its own analysis on the underlying EPFD data files*." SpaceX Oct. 17, 2022 Letter at 5 (JA0231) (emphasis added).

In *USTA*, this Court acknowledged "three specific types of legitimate outside party input into agency decision-making processes: (1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving." 359 F.3d at 566. Such "legitimate outside party input" does not amount to unlawful subdelegation. But when outside party involvement goes beyond such

50

input and rises to "[w]hat [is] essentially a legislative determination," the unlawful subdelegation doctrine requires invalidation of the subdelegated action unless the subdelegation was clearly authorized by law—which clearly is not true here. *See Texas v. Comm'r*, 142 S. Ct. 1308, 1309 (2022) (statement of Alito, Thomas, & Gorsuch, JJ.). This case does not fit into any of the three types of acceptable outside party input.

*First*, the FCC went beyond making ITU approval a condition. "[A] federal agency entrusted with broad discretion to permit or forbid certain activities may condition its grant of permission on the decision of another entity . . . so long as there is a reasonable connection between the outside entity's decision and the federal agency's determination." *USTA*, 359 F.3d at 567. The use of conditions recognizes that approval by one entity is sometimes useless without the approval of another. *See, e.g.*, *United States v. Matherson*, 367 F. Supp. 779, 782 (E.D.N.Y. 1973) (allowing federal agency to condition grant of vehicular permit on grant of local government permit because traveling through local land was required to reach the National Seashore). The ITU's promulgation of power limits and the independent endorsement of these limits by the

Commission is consistent with 47 U.S.C. § 303(r), which directs the Commission to harmonize federal law with international treaties.  But that makes ITU approval a floor, not a ceiling, on the Commission's independent obligation to prevent interference.

The ITU's role did not relieve the Commission of its own obligation to exercise final authority to scrutinize SpaceX's application. In cases where courts have approved a delegation, the agency remains as a backstop. *See, e.g.*, *Consumers' Research v. FCC*, 63 F.4th 441, 451-52 (5th Cir. 2023) (finding lawful delegation of authority to the "subordinate[]" Universal Service Administration Company because the FCC exercised final review "after independent consideration of the collected data and other relevant information"); *Texas v. Rettig*, 987 F.3d 518, 533 (5th Cir. 2021) (upholding subdelegation when the agency conducted an independent review and "look[ed] at all of the assumptions, data, and methodology").  Likewise, in *South Pacific Transportation Co. v. Watt*, 700 F.2d 550 (9th Cir. 1983), the Ninth Circuit held that the Secretary of the Interior could condition approval on the Indian Tribe's approval of the railroad's right-of-way application as approval from both entities was necessary and "[t]he regulation [did]

not relinquish to a tribe the final authority to approve; *it delegates a power to disapprove*."  *Id.* at 556 (emphasis added).  Here, the Commission did not merely delegate a power to disapprove—it abdicated its own final approval authority, effectively treating the ITU's approval as determinative.  Order ¶ 34 (JA0040-41).

    *Second*, the ITU does not merely conduct "fact-gathering" for the Commission, contrary to the assertion in the Order that "the ITU merely provides us 'with factual information.'"  *Id.* ¶ 28 (JA0036).  The Commission concluded that the ITU is responsible for making the actual determination as to whether power limits would be violated and, thus, whether SpaceX may operate it system.  *Id.* ¶ 27 (JA0035-36) ("[T]he ITU is in the best position to review compliance with applicable EPFD limits.").  A true "fact gathering" function would merely involve the ITU assisting the Commission with determining the power output of the SpaceX system.  For example, in *Southwest Airlines Co. v. TSA*, this Court found the agency did not unlawfully subdelegate its authority by hiring a consultant to draft a report detailing factual findings on the "screening of non-passengers during the year 2000."  650 F.3d 752, 758 (D.C. Cir. 2011).  But here, the Commission delegated to the ITU the

authority to determine whether SpaceX complies with those limits, not merely the fact-finding responsibility to determine a satellite's system EPFD.  SpaceX itself admitted during the proceeding that the Commission unlawfully delegated to the ITU by claiming that the ITU provides the Commission with the "factual information" of "whether SpaceX complies with the ITU's EPFD limits," which inherently includes the ITU's power to set those EPFD limits and apply those limits to any gathered facts.  SpaceX Oct. 17, 2022 Letter at 4 (JA0230).  The Order's attempt to cloak itself in the fact gathering exception from *USTA* thus falls flat.

Even more egregiously, the ITU has not yet conducted its interference review, and the Commission waived that requirement until after SpaceX's service commences.  Order ¶ 40 (JA0043-44).  *USTA* found a problem because "FCC oversight [was] neither timely nor assured," 359 F.3d at 567—and here the Commission is openly acknowledging that it has not conducted *any* oversight and will not even require ITU review before SpaceX commences operations.

*Third*, the ITU does not merely provide permissible advice to the Commission.  Rather, the Commission "rubber-stamped" interference

54

determinations made by the ITU—and did so *prospectively* before they were even made, obviating any argument that the Commission is providing any check whatsoever on the ITU. "[A] federal agency may turn to an outside entity for advice and policy recommendations, *provided the agency makes the final decisions itself.*" *USTA*, 359 F.3d at 568 (emphasis added). An "agency may not, however, merely 'rubber-stamp' decisions made by others under the guise of seeking their 'advice,' nor will vague or inadequate assertions of final reviewing authority save an unlawful subdelegation." *Id.* (cleaned up). Here, the Commission refused to reserve for itself any final review authority. The Commission's refusal to either review SpaceX's data for itself or review the ITU's findings puts the ITU in the saddle of United States interference policy.

Finally, the delegate itself sometimes does not want the job. The ITU seems to believe that compliance with the limits is the licensing country's job in cases where the ITU's software cannot adequately model the non-geostationary system. In these cases, the ITU expects an acknowledgment of the difficulty and a commitment of compliance from

the domestic licensing administration.  *See* Circular at 2-3; ITU

Resolution 85 (WRC-03).

    The subdelegation is all the more inappropriate because the

consignment of the question of interference to the ITU robs DISH of its

statutory right to appeal, 47 U.S.C. § 402(b)(6), and strips this Court of

its rightful jurisdiction.  DISH has no right or ability to be heard before

the ITU and no avenue to appeal or otherwise challenge its ultimate

determination.  Rather, only countries (or "national administrations")

have standing to complain of interference problems with the ITU.  Here,

this process is impaired by a fundamental conflict of interest.

Specifically, the ITU will entertain objections to one administration's

showing of compliance made by other administrations.  ITU RR 13.6.

The second-generation system operates under ITU network filings made

or to be made by the United States.  DISH is represented by the United

States for all of its affected satellites.  The FCC, which represents the

United States at the ITU, has already told DISH it will not consider its

interference evidence.  And in any event, the FCC cannot

compartmentalize itself into two entities arguing to the ITU against one

another, one making the showing to the ITU and the other pointing out its defects.

Because the Order is premised on the FCC's violations of the unlawful subdelegation doctrine, the Order is contrary to law.

## CONCLUSION

For the foregoing reasons, this Court should vacate the Order with respect to the Gen2 system's authorization to use the 12 GHz band.

Dated:  August 8, 2023                    Respectfully submitted,

Jeffrey H. Blum                           /s/ *Pantelis Michalopoulos*
Alison Minea                              Pantelis Michalopoulos
Hadass Kogan                              Andrew M. Golodny
**DISH NETWORK CORPORATION**              Mark C. Savignac
1110 Vermont Avenue NW                    William Travis West
Suite 450                                 **STEPTOE & JOHNSON LLP**
Washington, D.C. 20005                    1330 Connecticut Avenue NW
                                          Washington, D.C.  20036
                                          (202) 429-6494

                                          *Counsel for DISH Network Corp.*

## CERTIFICATE OF COMPLIANCE

I, Andrew K. Magloughlin, counsel for Appellant DISH Network Corporation, hereby certify pursuant to Fed. R. App. P. 32(g) that the brief complies with the type-volume limitations of Fed. R. App. P. 27(d)(2).  This motion was prepared in a proportionally space typeface using 14-point, Century font, and contains 10,571 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).


Dated: August 8, 2023                    /s/ *Andrew K. Magloughlin*
                                         Andrew K. Magloughlin
                                         STEPTOE & JOHNSON LLP
                                         1330 Connecticut Ave. NW
                                         Washington, D.C. 20036
                                         (202) 429-5508

# STATUTES AND REGULATIONS ADDENDUM

# STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

### Statutes

1.    5 U.S.C. § 706 ....................................................................ADD2

2.    28 U.S.C. § 2112(b) ...........................................................ADD3

3.    47 U.S.C. § 303(c), (f), (r) ................................................ADD4

4.    47 U.S.C. § 307(a) .............................................................ADD5

5.    47 U.S.C. § 309(a) .............................................................ADD6

6.    47 U.S.C. § 316(a)(1) ........................................................ADD7

7.    47 U.S.C. § 402(b), (c) ......................................................ADD8

### Regulations

8.    47 C.F.R. § 1.4(b)(2).........................................................ADD11

9.    47 C.F.R. § 1.1202(a) ........................................................ADD12

10.   47 C.F.R. § 1.1204(a)(10)(iii) ...........................................ADD13

11.   47 C.F.R. § 1.1206 ............................................................ADD14

12.   47 C.F.R. § 2.106 n.5.487A ...............................................ADD21

13.   47 C.F.R. § 25.108  ...........................................................ADD22

14.   47 C.F.R. § 25.146 ............................................................ADD23

15.   47 C.F.R. § 25.289 ............................................................ADD25

### International

16.   ITU Radio Reg. 5.487A......................................................ADD27

17.   ITU Radio Reg. 13.6 ................................................................ADD28

18.   ITU Resolution 85 (WRC-03) ...............................................ADD29

19.   ITU-BR Circular CR/414, Examinations Under
      Resolution 85 (WRC-03) (published Dec. 6, 2016),
      https://www.itu.int/md/R00-CR-CIR-0414/en. ......................ADD31

# STATUTES

## 5 U.S.C. § 706

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 28 U.S.C. § 2112(b)

### § 2112. Record on review and enforcement of agency orders.

(b) The record to be filed in the court of appeals in such a proceeding shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency, board, commission, or officer concerned, or such portions thereof (1) as the rules prescribed under the authority of <u>section 2072</u> of this title may require to be included therein, or (2) as the agency, board, commission, or officer concerned, the petitioner for review or respondent in enforcement, as the case may be, and any intervenor in the court proceeding by written stipulation filed with the agency, board, commission, or officer concerned or in the court in any such proceeding may consistently with the rules prescribed under the authority of <u>section 2072</u> of this title designate to be included therein, or (3) as the court upon motion of a party or, after a prehearing conference, upon its own motion may by order in any such proceeding designate to be included therein. Such a stipulation or order may provide in an appropriate case that no record need be filed in the court of appeals. If, however, the correctness of a finding of fact by the agency, board, commission, or officer is in question all of the evidence before the agency, board, commission, or officer shall be included in the record except such as the agency, board, commission, or officer concerned, the petitioner for review or respondent in enforcement, as the case may be, and any intervenor in the court proceeding by written stipulation filed with the agency, board, commission, or officer concerned or in the court agree to omit as wholly immaterial to the questioned finding. If there is omitted from the record any portion of the proceedings before the agency, board, commission, or officer which the court subsequently determines to be proper for it to consider to enable it to review or enforce the order in question the court may direct that such additional portion of the proceedings be filed as a supplement to the record. The agency, board, commission, or officer concerned may, at its option and without regard to the foregoing provisions of this subsection, and if so requested by the petitioner for review or respondent in enforcement shall, file in the court the entire record of the proceedings before it without abbreviation.

## 47 U.S.C. § 303 (c), (f), (r)

## § 303. Powers and duties of Commission

Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

\*    \*    \*

(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

\*    \*    \*

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: Provided, however, That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with;

\*    \*    \*

(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.

\*    \*    \*

## 47.U.S.C § 307(a)

### § 307. Licenses

(a) Grant

The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter.

## 47. U.S.C. § 309(a)

### § 309. Application for license

## (a) Considerations in granting application

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

# 47. U.S.C. § 316(a)(1)

## § 316. Modification by Commission of station licenses or construction permits; burden of proof

(a)(1) Any station license or construction permit may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the United States will be more fully complied with. No such order of modification shall become final until the holder of the license or permit shall have been notified in writing of the proposed action and the grounds and reasons therefor, and shall be given reasonable opportunity, of at least thirty days, to protest such proposed order of modification; except that, where safety of life or property is involved, the Commission may by order provide, for a shorter period of notice.

## 47 U.S.C. § 402(b), (c)

§ 402. Judicial review of Commission's orders and decisions

(b) Right to appeal

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

(2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

(3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

(4) By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

(5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

(8) By any radio operator whose license has been suspended by the Commission.

(9) By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

(10) By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 618(a)(3) of this title.

(c) Filing notice of appeal; contents; jurisdiction; temporary orders

Such appeal shall be taken by filing a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of. Such notice of appeal shall contain a concise statement of the nature of the proceedings as to which the appeal is taken; a concise statement of the reasons on which the appellant intends to rely, separately stated and numbered; and proof of service of a true copy of said notice and statement upon the Commission. Upon filing of such notice, the court shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper. Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo in the matter in which the appeal is taken or the restoration of a position or status terminated or adversely affected by the order appealed from and shall, unless otherwise ordered by the court, be effective pending hearing and determination of said appeal and compliance by the Commission with the final judgment of the court rendered in said appeal.

# REGULATIONS

## 47 C.F.R. § 1.4(b)(2)

### § 1.4 Computation of time.

(b) General Rule—Computation of Beginning Date When Action is Initiated by Commission or Staff. Unless otherwise provided, the first day to be counted when a period of time begins with an action taken by the Commission, an Administrative Law Judge or by members of the Commission or its staff pursuant to delegated authority is the day after the day on which public notice of that action is given. See § 1.4(b)(1)–(5) of this section. Unless otherwise provided, all Rules measuring time from the date of the issuance of a Commission document entitled "Public Notice" shall be calculated in accordance with this section. See § 1.4(b)(4) of this section for a description of the "Public Notice" document. Unless otherwise provided in § 1.4(g) and (h) of this section, it is immaterial whether the first day is a "holiday." For purposes of this section, the term public notice means the date of any of the following events: See § 1.4(e)(1) of this section for definition of "holiday."

(2) For non-rulemaking documents released by the Commission or staff, including the Commission's section 271 determinations, 47 U.S.C. 271, the release date.

Example 3: The Chief, Mass Media Bureau, adopts an order on Thursday, April 2, 1987. The text of that order is not released to the public until Friday, April 3, 1987. Public notice of this decision is given on Friday, April 3, 1987. Saturday, April 4, 1987, is the first day to be counted in computing filing periods.

47 C.F.R. § 1.1202(a)

§ 1.1202 Definitions.

For the purposes of this subpart, the following definitions apply:

(a) Presentation. A communication directed to the merits or outcome of a proceeding, including any attachments to a written communication or documents shown in connection with an oral presentation directed to the merits or outcome of a proceeding. Excluded from this term are communications which are inadvertently or casually made, inquiries concerning compliance with procedural requirements if the procedural matter is not an area of controversy in the proceeding, statements made by decisionmakers that are limited to providing publicly available information about pending proceedings, and inquiries relating solely to the status of a proceeding, including inquiries as to the approximate time that action in a proceeding may be taken. However, a status inquiry which states or implies a view as to the merits or outcome of the proceeding or a preference for a particular party, which states why timing is important to a particular party or indicates a view as to the date by which a proceeding should be resolved, or which otherwise is intended to address the merits or outcome or to influence the timing of a proceeding is a presentation.

Note to paragraph (a): A communication expressing concern about administrative delay or expressing concern that a proceeding be resolved expeditiously will be treated as a permissible status inquiry so long as no reason is given as to why the proceeding should be expedited other than the need to resolve administrative delay, no view is expressed as to the merits or outcome of the proceeding, and no view is expressed as to a date by which the proceeding should be resolved. A presentation by a party in a restricted proceeding not designated for hearing requesting action by a particular date or giving reasons that a proceeding should be expedited other than the need to avoid administrative delay (and responsive presentations by other parties) may be made on an ex parte basis subject to the provisions of § 1.1204(a)(11).

ADD12

## 47 C.F.R. § 1.1204(a)(10)(iii)

§ 1.1204 Exempt ex parte presentations and proceedings.

(a) Exempt ex parte presentations. The following types of presentations are exempt from the prohibitions in restricted proceedings (§ 1.1208), the disclosure requirements in permit-but-disclose proceedings (§ 1.1206), and the prohibitions during the Sunshine Agenda period prohibition (§ 1.1203):

\*    \*    \*

(10) The presentation is requested by (or made with the advance approval of) the Commission or staff for the clarification or adduction of evidence, or for resolution of issues, including possible settlement, subject to the following limitations:

\*    \*    \*

(iii) If the presentation is made in a proceeding subject to permit-but-disclose requirements, disclosure of any new written information elicited from such request or a summary of any new oral information elicited from such request must be made in accordance with the requirements of § 1.1206(b), provided, however, that the Commission or its staff may determine that disclosure would interfere with the effective conduct of an investigation and dispense with the disclosure requirement. As in paragraph (a)(10)(ii) of this section, information relating to how a proceeding should or could be settled, as opposed to new information regarding the merits, shall not be deemed to be new information for purposes of this section;

Note 2 to paragraph (a): If the Commission or its staff dispenses with the service or notice requirement to avoid interference with an investigation, a determination will be made in the discretion of the Commission or its staff as to when and how disclosure should be made if necessary. See Amendment of Subpart H, Part I, 2 FCC Rcd 6053, 6054 ¶¶10–14 (1987).

## 47 C.F.R. § 1.1206

### § 1.1206 Permit-but-disclose proceedings.

(a) Unless otherwise provided by the Commission or the staff pursuant to § 1.1200(a), until the proceeding is no longer subject to administrative reconsideration or review or to judicial review, ex parte presentations (other than ex parte presentations exempt under § 1.1204(a)) to or from Commission decision-making personnel are permissible in the following proceedings, which are referred to as permit-but-disclose proceedings, provided that ex parte presentations to Commission decision-making personnel are disclosed pursuant to paragraph (b) of this section:

Note 1 to paragraph (a): In the case of petitions for declaratory ruling that seek Commission preemption of state or local regulatory authority and petitions for relief under 47 U.S.C. 332(c)(7)(B)(v), the petitioner must serve the original petition on any state or local government, the actions of which are specifically cited as a basis for requesting preemption. Service should be made on those bodies within the state or local governments that are legally authorized to accept service of legal documents in a civil context. Such pleadings that are not served will be dismissed without consideration as a defective pleading and treated as a violation of the ex parte rules unless the Commission determines that the matter should be entertained by making it part of the record under § 1.1212(d) and the parties are so informed.

(1) An informal rulemaking proceeding conducted under section 553 of the Administrative Procedure Act other than a proceeding for the allotment of a broadcast channel, upon release of a Notice of Proposed Rulemaking (see also § 1.1204(b)(2));

(2) A proceeding involving a rule change, policy statement or interpretive rule adopted without a Notice of Proposed Rule Making upon release of the order adopting the rule change, policy statement or interpretive rule;

(3) A declaratory ruling proceeding;

(4) A tariff proceeding which has been set for investigation under section 204 or 205 of the Communications Act (including directly associated waiver requests or requests for special permission) (see also § 1.1204(b)(4));

(5) Unless designated for hearing, a proceeding under section 214(a) of the Communications Act that does not also involve applications under Title III of the Communications Act (see also § 1.1208);

(6) Unless designated for hearing, a proceeding involving an application for a Cable Landing Act license that does not also involve applications under Title III of the Communications Act (see also § 1.1208);

(7) A proceeding involving a request for information filed pursuant to the Freedom of Information Act;

Note 2 to paragraph (a): Where the requested information is the subject of a request for confidentiality, the person filing the request for confidentiality shall be deemed a party.

(8) A proceeding before a Joint Board or a proceeding before the Commission involving a recommendation from a Joint Board;

(9) A proceeding conducted pursuant to section 220(b) of the Communications Act for prescription of common carrier depreciation rates upon release of a public notice of specific proposed depreciation rates (see also § 1.1204(b)(4));

(10) A proceeding to prescribe a rate of return for common carriers under section 205 of the Communications Act; and

(11) A cable rate complaint proceeding pursuant to section 623(c) of the Communications Act where the complaint is filed on FCC Form 329.

(12) [Reserved]

(13) Petitions for Commission preemption of authority to review interconnection agreements under § 252(e)(5) of the Communications Act and petitions for preemption under § 253 of the Communications Act.

Note 3 to paragraph (a): In a permit-but-disclose proceeding involving only one "party," as defined in § 1.1202(d) of this section, the party and the Commission may freely make presentations to each other and need not comply with the disclosure requirements of paragraph (b) of this section.

(b) The following disclosure requirements apply to ex parte presentations in permit but disclose proceedings:

(1) Oral presentations. A person who makes an oral ex parte presentation subject to this section shall submit to the Commission's Secretary a memorandum that lists all persons attending or otherwise participating in the meeting at which the ex parte presentation was made, and summarizes all data presented and arguments made during the oral ex parte presentation. Memoranda must contain a summary of the substance of the ex parte presentation and not merely a listing of the subjects discussed. More than a one or two sentence description of the views and arguments presented is generally required. If the oral ex parte presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.

Note to paragraph (b)(1): Where, for example, presentations occur in the form of discussion at a widely attended meeting, preparation of a memorandum as specified in the rule might be cumbersome. Under these circumstances, the rule may be satisfied by submitting a transcript or recording of the discussion as an alternative to a memorandum. Likewise, Commission staff in its discretion may file an ex parte summary of a multiparty meeting as an alternative to having each participant file a summary.

(2) Written and oral presentations. A written ex parte presentation and a memorandum summarizing an oral ex parte presentation (and cover letter, if any) shall clearly identify the proceeding to which it relates, including the docket number, if any, and must be labeled as an ex parte

presentation. Documents shown or given to Commission staff during ex parte meetings are deemed to be written ex parte presentations and, accordingly, must be filed consistent with the provisions of this section. Consistent with the requirements of § 1.49 paragraphs (a) and (f), additional copies of all written ex parte presentations and notices of oral ex parte presentations, and any replies thereto, shall be mailed, e-mailed or transmitted by facsimile to the Commissioners or Commission employees who attended or otherwise participated in the presentation.

(i) In proceedings governed by § 1.49(f) or for which the Commission has made available a method of electronic filing, written ex parte presentations and memoranda summarizing oral ex parte presentations, and all attachments thereto, shall, when feasible, be filed through the electronic comment filing system available for that proceeding, and shall be filed in a native format (e.g., .doc, .xml, .ppt, searchable .pdf). If electronic filing would present an undue hardship, the person filing must request an exemption from the electronic filing requirement, stating clearly the nature of the hardship, and submitting an original and one copy of the written ex parte presentation or memorandum summarizing an oral ex parte presentation to the Secretary, with a copy by mail or by electronic mail to the Commissioners or Commission employees who attended or otherwise participated in the presentation.

(ii) Confidential Information. In cases where a filer believes that one or more of the documents or portions thereof to be filed should be withheld from public inspection, the filer should file electronically a request that the information not be routinely made available for public inspection pursuant to § 0.459 of this chapter. Accompanying any such request, the filer shall include in paper form a copy of the document(s) containing the confidential information, and also shall file electronically a copy of the same document(s) with the confidential information redacted. The redacted document shall be machine-readable whenever technically possible. Where the document to be filed electronically contains metadata that is confidential or protected from disclosure by a legal privilege (including, for example, the attorney-client privilege), the filer may remove such metadata from the document before filing it electronically.

(iii) Filing dates outside the Sunshine period. Except as otherwise provided in paragraphs (b)(2)(iv) and (v) of this section, all written ex parte presentations and all summaries of oral ex parte presentations must be filed no later than two business days after the presentation. As set forth in § 1.4(e)(2), a "business day" shall not include a holiday (as defined in § 1.4(e)(1)). In addition, for purposes of computing time limits under the rules governing ex parte presentations, a "business day" shall include the full calendar day (i.e., from 12:00 a.m. Eastern Time until 11:59:59 p.m. Eastern Time).

Example: On Tuesday a party makes an ex parte presentation in a permit-but-disclose proceeding to a Commissioner. The second business day following the ex parte presentation is the following Thursday (absent an intervening holiday). The presenting party must file its ex parte notice before the end of the day (11:59:59 p.m.) on Thursday. Similarly, if an ex parte presentation is made on Friday, the second business day ordinarily would be the following Tuesday, and the ex parte notice must be filed no later than 11:59:59 p.m. on that Tuesday.

(iv) Filing dates for presentations made on the day that the Sunshine notice is released. For presentations made on the day the Sunshine notice is released, any written ex parte presentation or memorandum summarizing an oral ex parte presentation required pursuant to § 1.1206 or § 1.1208 must be submitted no later than the end of the next business day. Written replies, if any, shall be filed no later than two business days following the presentation, and shall be limited in scope to the specific issues and information presented in the ex parte filing to which they respond.

Example: On Tuesday, a party makes an ex parte presentation in a permit-but-disclose proceeding to a Commissioner. That same day, the Commission's Secretary releases the Sunshine Agenda for the next Commission meeting and that proceeding appears on the Agenda. The Sunshine period begins as of Wednesday, and therefore the presenting party must file its ex parte notice by the end of the day (11:59:59 p.m.) on Wednesday. A reply would be due by the end of the day (11:59:59 p.m.) on Thursday.

(v) Filing dates during the Sunshine Period. If an ex parte presentation is made pursuant to an exception to the Sunshine period prohibition, the written ex parte presentation or memorandum summarizing an oral ex parte presentation required under this paragraph shall be submitted by the end of the same business day on which the ex parte presentation was made. The memorandum shall identify plainly on the first page the specific exemption in § 1.1203(a) on which the presenter relies, and shall also state the date and time at which any oral ex parte presentation was made. Written replies to permissible ex parte presentations made pursuant to an exception to the Sunshine period prohibition, if any, shall be filed no later than the next business day following the presentation, and shall be limited in scope to the specific issues and information presented in the ex parte filing to which they respond.

Example: On Tuesday, the Commission's Secretary releases the Sunshine Agenda for the next Commission meeting, which triggers the beginning of the Sunshine period on Wednesday. On Thursday, a party makes an ex parte presentation to a Commissioner on a proceeding that appears on the Sunshine Agenda. That party must file an ex parte notice by the end of the day (11:59:59 p.m.) on Thursday. A reply would be due by the end of the day (11:59:59 p.m.) on Friday.

(vi) If a notice of an oral ex parte presentation is incomplete or inaccurate, staff may request the filer to correct any inaccuracies or missing information. Failure by the filer to file a corrected memorandum in a timely fashion as set forth in paragraph (b) of this section, or any other evidence of substantial or repeated violations of the rules on ex parte contacts, should be reported to the General Counsel.

(3) Notwithstanding paragraphs (b)(1) and (2) of this section, permit-but-disclose proceedings involving presentations made by members of Congress or their staffs or by an agency or branch of the Federal Government or its staff shall be treated as ex parte presentations only if the presentations are of substantial significance and clearly intended to affect the ultimate decision. The Commission staff shall prepare written summaries of any such oral presentations and place them in the record

in accordance with paragraph (b) of this section and also place any written presentations in the record in accordance with that paragraph.

(4) Notice of ex parte presentations. The Commission's Secretary shall issue a public notice listing any written ex parte presentations or written summaries of oral ex parte presentations received by his or her office relating to any permit-but-disclose proceeding. Such public notices generally should be released at least twice per week.

Note to paragraph (b): Interested persons should be aware that some ex parte filings, for example, those not filed in accordance with the requirements of this paragraph (b), might not be placed on the referenced public notice. All ex parte presentations and memoranda filed under this section will be available for public inspection in the public file or record of the proceeding, and parties wishing to ensure awareness of all filings should review the public file or record.

## 47 C.F.R. § 2.106 n.5.487A

5.487A    *Additional allocation*:  in Region 1, the band 11.7-12.5 GHz, in Region 2, the band 12.2-12.7 GHz and, in Region 3, the band 11.7-12.2 GHz, are also allocated to the fixed-satellite service (space-to-Earth) on a primary basis, limited to non-geostationary systems and subject to application of the provisions of No. 9.12 for coordination with other non-geostationary-satellite systems in the fixed-satellite service. Non-geostationary-satellite systems in the fixed-satellite service shall not claim protection from geostationary-satellite networks in the broadcasting-satellite service operating in accordance with the Radio Regulations, irrespective of the dates of receipt by the Bureau of the complete coordination or notification information, as appropriate, for the non-geostationary-satellite systems in the fixed-satellite service and of the complete coordination or notification information, as appropriate, for the geostationary-satellite networks, and No. 5.43A does not apply. Non-geostationary-satellite systems in the fixed-satellite service in the above bands shall be operated in such a way that any unacceptable interference that may occur during their operation shall be rapidly eliminated.

## 47 C.F.R. § 25.108

(a) Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All approved incorporation by reference (IBR) material is available for inspection at the FCC and the National Archives and Records Administration (NARA). Contact FCC through the Federal Communications Commission's Reference Information Center, phone: (202) 418–0270. For information on the availability of this material at NARA, visit www.archives.gov/federal-register/cfr/ibr-locations.html or email fr.inspection@nara.gov or go to. The material may be obtained from the sources in the following paragraphs of this section.

…

(c) International Telecommunication Union (ITU), Place des Nations, 1211 Geneva 20 Switzerland; www.itu.int; Voice: +41 22 730 5111; Fax: +41 22 733 7256; email: itumail@itu.int.

(8) ITU Radio Regulations, Volume 3: Resolutions and Recommendations, Resolution 76 (Rev.WRC–15), "Protection of geostationary fixed-satellite service and geostationary broadcasting-satellite service networks from the maximum aggregate equivalent power flux-density produced by multiple non-geostationary fixed-satellite service systems in frequency bands where equivalent power flux-density limits have been adopted," Edition of 2016, copyright 2016, http://www.itu.int/pub/R–REG–RR–2016. Incorporation by reference approved for § 25.146(a).

(9) ITU Radio Regulations, Volume 3: Resolutions and Recommendations, Resolution 85 (WRC–03), "Application of Article 22 of the Radio Regulations to the protection of geostationary fixed-satellite service and broadcasting-satellite service networks from non-geostationary fixed-satellite service systems," Edition of 2016, copyright 2016, http://www.itu.int/pub/R–REG–RR–2016. Incorporation by reference approved for § 25.146(c).

## 47 C.F.R. § 25.146

### § 25.146 Licensing and operating provisions for NGSO FSS space stations.

(a) An NGSO FSS applicant proposing to operate in the 10.7–30 GHz frequency range must certify that it will comply with:

(1) Any applicable power flux-density levels in Article 21, Section V, Table 21–4 of the ITU Radio Regulations (incorporated by reference, § 25.108), except that in the 19.3–19.4 GHz and 19.6–19.7 GHz bands applicants must certify that they will comply with the ITU PFD limits governing NGSO FSS systems in the 17.7–19.3 GHz band; and

(2) Any applicable equivalent power flux-density levels in Article 22, Section II, and Resolution 76 of the ITU Radio Regulations (both incorporated by reference, § 25.108).

(b) [Reserved by 86 FR 11644]

(c) Prior to the initiation of service, an NGSO FSS operator licensed or holding a market access authorization to operate in the 10.7–30 GHz frequency range must receive a "favorable" or "qualified favorable" finding by the ITU Radiocommunication Bureau, in accordance with Resolution 85 of the ITU Radio Regulations (incorporated by reference, § 25.108), regarding its compliance with applicable ITU EPFD limits. In addition, a market access holder in these bands must:

(1) Communicate the ITU finding to the Commission; and

(2) Submit the input data files used for the ITU validation software.

(d) Coordination will be required between NGSO FSS systems and GSO FSS earth stations in the 10.7–12.75 GHz band when:

(1) The GSO satellite network has receive earth stations with earth station antenna maximum isotropic gain greater than or equal to 64 dBi; G/T of 44 dB/K or higher; and emission bandwidth of 250 MHz; and

(2) The EPFDdown radiated by the NGSO satellite system into the GSO specific receive earth station, either within the U.S. for domestic service or any points outside the U.S. for international service, as calculated using the ITU software for examining compliance with EPFD limits exceeds—174.5 dB(W/(m²/40kHz)) for any percentage of time for NGSO systems with all satellites only operating at or below 2500 km altitude, or—202 dB(W/(m²/40kHz)) for any percentage of time for NGSO systems with any satellites operating above 2500 km altitude.

(e) An NGSO FSS licensee or market access recipient must ensure that ephemeris data for its constellation is available to all operators of authorized, in-orbit, co-frequency satellite systems in a manner that is mutually acceptable.

## 47 C.F.R. § 25.289

§ 25.289 Protection of GSO networks by NGSO systems.


Unless otherwise provided in this chapter, an NGSO system licensee must not cause unacceptable interference to, or claim protection from, a GSO FSS or GSO BSS network. An NGSO FSS licensee operating in compliance with the applicable equivalent power flux-density limits in Article 22, Section II of the ITU Radio Regulations (incorporated by reference, § 25.108) will be considered as having fulfilled this obligation with respect to any GSO network.

# INTERNATIONAL

## ITU RR 5.487A

5.487A    *Additional allocation*:  in Region 1, the band 11.7-12.5 GHz, in Region 2, the band 12.2-12.7 GHz and, in Region 3, the band 11.7-12.2 GHz, are also allocated to the fixed-satellite service (space-to-Earth) on a primary basis, limited to non-geostationary systems and subject to application of the provisions of No. 9.12 for coordination with other non-geostationary-satellite systems in the fixed-satellite service. Non-geostationary-satellite systems in the fixed-satellite service shall not claim protection from geostationary-satellite networks in the broadcasting-satellite service operating in accordance with the Radio Regulations, irrespective of the dates of receipt by the Bureau of the complete coordination or notification information, as appropriate, for the non-geostationary-satellite systems in the fixed-satellite service and of the complete coordination or notification information, as appropriate, for the geostationary-satellite networks, and No. 5.43A does not apply. Non-geostationary-satellite systems in the fixed-satellite service in the above bands shall be operated in such a way that any unacceptable interference that may occur during their operation shall be rapidly eliminated.

## ITU RR 13.6

13.6        b) whenever it appears from reliable information available that a recorded assignment has not been brought into use, or is no longer in use, or continues to be in use but not in accordance with the notified required characteristics1 as specified in Appendix 4, the Bureau shall consult the notifying administration and request clarification as to whether the assignment was brought into use in accordance with the notified characteristics or continues to be in use in accordance with the notified characteristics. Such a request shall include the reason for the query. In the event of a response and subject to the agreement of the notifying administration the Bureau shall cancel, suitably modify, or retain the basic characteristics of the entry. If the notifying administration does not respond within three months, the Bureau shall issue a reminder. In the event the notifying administration does not respond within one month of the first reminder, the Bureau shall issue a second reminder. In the event the notifying administration does not respond within one month of the second reminder, action taken by the Bureau to cancel the entry shall be subject to a decision of the Board. In the event of non-response or disagreement by the notifying administration, the entry will continue to be taken into account by the Bureau when conducting its examinations until the decision to cancel or modify the entry is made by the Board. In the event of a response, the Bureau shall inform the notifying administration of the conclusion reached by the Bureau within three months of the administration's response. When the Bureau is not in a position to comply with the three-month deadline referred to above, the Bureau shall so inform the notifying administration together with the reasons therefor. In case of disagreement between the notifying administration and the Bureau, the matter shall be carefully investigated by the Board, including taking into account submissions of additional supporting materials from administrations through the Bureau within the deadlines as established by the Board. The application of this provision shall not preclude the application of other provisions of the Radio Regulations. (WRC-19)

ADD28

# RESOLUTION 85 (WRC-03)

## Application of Article 22 of the Radio Regulations to the protection of geostationary fixed-satellite service and broadcasting-satellite service networks from non-geostationary fixed-satellite service systems

The World Radiocommunication Conference (Geneva, 2003),

*considering*

*a)*        that WRC-2000 adopted, in Article **22**, single-entry limits applicable to non-geostationary (non-GSO) fixed-satellite service (FSS) systems in certain parts of the frequency range 10.7-30 GHz to protect geostationary-satellite (GSO) networks operating in the same frequency bands;

*b)*        that, taking into account Nos. **22.5H** and **22.5I**, wherever the limits referred to in *considering a)* are exceeded by a non-GSO FSS system to which the limits apply without the agreement of the concerned administrations, this constitutes a violation of the obligations under No. **22.2**;

*c)*        that ITU-R has developed Recommendation ITU-R S.1503 to provide a functional description to be used in developing software tools for determining the conformity of non-GSO FSS networks with limits contained in Article **22**;

*d)*        that there is currently no software tool available to the Radiocommunication Bureau for epfd examinations;

*e)*        that the Bureau has issued Circular Letters CR/176 and CR/182, which request additional information from non-GSO systems in order to examine them for compliance with the Article **22** epfd limits;

*f)*        that, since no epfd validation software is available, the Bureau has requested commitments from the notifying administrations that they will meet the epfd limits in Tables **22-1A**, **22-1B**, **22-1C**, **22-1D**, **22-1E**, **22-2** and **22-3**, and that under these commitments the Bureau gives qualified favourable findings to their systems;

*g)*        that the Bureau is not in a position to perform its duties in relation to Nos. **9.7A** and **9.7B** due to the lack of epfd validation software;

*h)*        that during the examination under Nos. **9.35** and **11.31**, the Bureau examines non-GSO FSS systems to ensure their compliance with the single-entry epfd limits given in Tables **22-1A**, **22-1B**, **22-1C**, **22-1D**, **22-1E**, **22-2** and **22-3**,

*resolves*

1        that since the Bureau is unable to examine non-GSO FSS systems subject to Nos. **22.5C**, **22.5D** and **22.5F** under Nos. **9.35** and/or **11.31**, the notifying administration shall send to the Bureau a commitment that the non-GSO FSS system complies with the limits given in Tables **22-1A**, **22-1B**, **22-1C**, **22-1D**, **22-1E**, **22-2** and **22-3** in addition to the information submitted under Nos. **9.30** and **11.15**;

ADD29

2        that the Bureau shall issue either a qualified favourable finding under No. **9.35** or a favourable finding with a date of review under No. **11.31** with respect to the limits contained in Tables **22-1A**, **22-1B**, **22-1C**, **22-1D**, **22-1E**, **22-2** and **22-3**, if *resolves* 1 is satisfied, otherwise the non-GSO FSS system will receive a definitive unfavourable finding;

3        that if an administration believes that a non-GSO FSS system, for which the commitment referred to in *resolves* 1 was sent, has the potential to exceed the limits given in Tables **22-1A**, **22-1B**, **22-1C**, **22-1D**, **22-1E**, **22-2** and **22-3**, it may request from the notifying administration additional information with regard to the compliance with the limits mentioned above. Both administrations shall cooperate to resolve any difficulties, with the assistance of the Bureau, if so requested by either of the parties, and may exchange any additional relevant information that may be available;

4        that the Bureau shall determine coordination requirements between GSO FSS earth stations and non-GSO FSS systems under Nos. **9.7A** and **9.7B** based on bandwidth overlap, and GSO FSS earth station antenna maximum isotropic gain, *G*/*T* and emission bandwidth;

5        that this Resolution shall no longer be applied after the Bureau has communicated to all administrations via a Circular Letter that the epfd validation software is available and the Bureau is able to verify compliance with the limits in Tables **22-1A**, **22-1B**, **22-1C**, **22-1D**, **22-1E**, **22-2** and **22-3** and to determine the coordination requirements under Nos. **9.7A** and **9.7B**,

> *further resolves*

that those provisions of the Radio Regulations that have been amended by this Conference and that are referred to in *resolves* 5 shall provisionally apply as from 5 July 2003,

> *instructs the Director of the Radiocommunication Bureau*

1        to encourage administrations to develop the epfd validation software;

2        to review, once the epfd validation software is available, its findings made in accordance with Nos. **9.35** and **11.31**;

3        to review, once the epfd validation software is available, the coordination requirements under Nos. **9.7A** and **9.7B**.

ADD30



**Radiocommunication Bureau (BR)**

Circular Letter                                                                                           6 December 2016
**CR/414**

**To the Administrations of ITU Member States**

Subject:              **Examinations under Resolution 85 (WRC-03)**

Resolution **85 (WRC-03)** requires the Radiocommunication Bureau to review, once the equivalent power flux-density (EPFD) validation software is available, its findings made in accordance with Nos. **9.35** and **11.31** for frequency assignments to non-GSO FSS satellite systems against the single-entry EPFD limits in Tables 22-1A, 22-1B, 22-1C, 22-1D, 22-1E, 22-2 and 22-3 in Article **22** of the Radio Regulations, and to determine the coordination requirements under Nos. **9.7A** and **9.7B.**

In Circular Letter CR/405 (3 June 2016), the Bureau informed administrations of the availability of a beta version of the EPFD validation software for testing and evaluation purposes.

Since the release of the beta version of the software, the Bureau has collected comments and suggestions for possible improvements to the software. Those comments have been taken into account in preparing the final version of the software.

The Bureau is pleased to inform your Administration that the final version of the software for implementing Recommendation ITU-R S.1503-2 is available on the ITU website www.itu.int/ITU-R/go/space-epfd/en and will be made available on the DVD version of BR IFIC (Space services) 2384/06.12.2016 and subsequent issues.

The EPFD validation package includes a Graphical Interface for Batch Calculations (GIBC) module used as an interface to launch the EPFD validation, two EPFD validation tools, two test cases and a user guide.

The purpose of this circular letter is to provide administrations and other users with information and guidance on the EPFD validation software and implementation of the *instructs the Director of the Radiocommunication Bureau* section of Resolution **85** (WRC-03).

In accordance with *instructs the Director of the Radiocommunication Bureau* 2 and 3 of Resolution **85**, the Bureau will be initiating a review of its findings made in accordance with Nos. **9.35** and **11.31**, as appropriate, and of the coordination requirements under Nos. **9.7A** and **9.7B**.

ADD31

International Telecommunication Union • Place des Nations, CH-1211 Geneva 20, Switzerland
Tel: +41 22 730 5111 • Fax: +41 22 733 7256 •
E-mail: itumail@itu.int • www.itu.int • www.itu.int/go/RR110

The Bureau will determine whether the frequency assignments to:

a) non-GSO FSS satellite systems comply with the EPFD limits contained in Tables **22-1A**, **22-1B, 22-1C, 22-1D, 22-1E, 22-2 and 22-3** of Article **22**;

b) specific large earth stations (under certain conditions) require coordination under No. **9.7A** with respect to any existing non-GSO FSS satellite systems using the coordination triggers in Appendix **5**; or

c) non-GSO FSS satellite systems require coordination under No. **9.7B** with respect to any large earth station (under certain conditions) using the coordination triggers in Appendix **5**.

For the above purposes, the Bureau will contact individually each administration having submitted non-geostationary satellite systems in the fixed-satellite service, including frequency assignments with qualified favourable findings in accordance with Resolution **85** (WRC-03), and request the administration to submit the following within three months from the date of dispatch of the communication:

- PFD and EIRP mask data (data elements under §A.14 of Appendix **4**) in accordance with the detailed description of the masks in Recommendation ITU-R S.1503-2, Part B. The mask data should  be submitted in XML format, the description of which can be found at www.itu.int/ITU-R/go/space-mask-XMLfile/en; and

- any other Appendix **4** data elements required for stations in a frequency band subject to Nos. 22.5C, 22.5D or 22.5F (i.e. subject to EPFD examination) which may have been missing in the original submissions or may require amendment in order to run the EPFD validation software correctly along with the PFD/EIRP mask data.

The above information would not change the formal date of receipt of the frequency assignments concerned if the information or clarification is provided within the three-month period indicated. In the case of a satellite system with different subsets of orbital characteristics that are mutually exclusive, the requested data shall be provided for each subset of orbital parameters subject to the limits in Article **22** and to No. **9.7B**.

If the required information is not provided within the aforementioned three-month period, the submission shall be deemed incomplete and a new formal date of receipt established when the complete information is received.

The submitted PFD and EIRP masks together with the results of the EPFD examination will be published in the BR IFIC (Space services) and posted at www.itu.int/ITU-R/go/space-epfd/en.

The 2015 World Radiocommunication Conference (WRC-15) reviewed the progress reported by the Director of BR regarding the development of the EPFD validation software, and at its eighth plenary meeting approved the second report of Committee 5 to the Plenary Meeting (see Documents CMR15/416 and CMR15/505) indicating that:

- *In cases where the software cannot adequately model certain non-geostationary satellite FSS systems, Resolution **85** (WRC-03) will continue to be applied until an update to Recommendation ITU-R S.1503 improving the modelling of those non-GSO systems has been agreed within ITU-R and has been implemented in the epfd validation software. This would not preclude the Bureau to undertake verification of the non-GSO FSS systems that can be modelled with the existing version of the software.*

ADD32

Filed: 08/08/2023

Document #2011461

USCA Case #23-1001

In accordance with the above decision, the Bureau would, upon receipt of an indication that *the software cannot adequately model* a particular *non-geostationary satellite FSS system,* refer the case to ITU-R Study Group 4/Working Party 4A for consideration as to whether further improvements to the Recommendation ITU-R S.1503-2 methodology are required in order to model the system adequately. To support this review by the Bureau and Study Group 4/Working Party 4A, further detailed technical description shall be provided, including *inter alia*:

1) the results of calculations using existing EPFD validation software;

2) the results of EPFD calculations using simulation software with adequate modelling of the non-geostationary system;

3) identification of particular areas of Recommendation ITU-R S.1503-2 that need to be reviewed and improved.

The above information will be published on the ITU website and as part of the submission made to Study Group 4/Working Party 4A for consideration. If Study Group 4/Working Party 4A concurs with the administration and concludes that a review of Recommendation ITU-R S.1503-2 is necessary in order to model the system adequately, the Bureau would maintain the "qualified favourable" findings until a new revision of Recommendation ITU-R S.1503 is agreed to and implemented in a new version of the EPFD validation software.

For any specific questions relating to the functioning of the EPFD validation software, or in order to put forward suggestions and ideas for possible improvements, administrations are invited to contact the Bureau via BRMail@itu.int or epfd-support@itu.int.

The Bureau remains at the disposal of your Administration, via the brmail@itu.int e-mail address or the specific EPFD validation tool forum, for any clarifications you may require with respect to the subjects covered in this circular letter.

François Rancy
Director

**Distribution:**

- Administrations of ITU Member States
- Members of the Radio Regulations Board

ADD33

## CERTIFICATE OF SERVICE

I hereby certify that, on August 8, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. I certify that the counsel of record for Appellees and Intervenor are registered as ECF Filers and that they will be served by the CM/ECF system.

/s/ *Pantelis Michalopoulos*
Pantelis Michalopoulos
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, D.C. 20036
(202) 429-6494